LOFT, INCORPORATED,

*vs.*

CHARLES G. GUTH, THE GRACE COMPANY, INC. OF DELAWARE, a corporation of the State of Delaware, and PEPSI-COLA COMPANY, a corporation of the State of Delaware.

*New Castle, Sept. 17, 1938.*

*Clarence A. Southerland,* of the firm of Ward & Gray, and *David L. Podell,* Hays, Podell & Shulman, and *Levien, Singer & Neuburger,* all of New York City (*Clarence A. Southerland,* of Wilmington, and *David L. Podell, Herman Shulman, Benjamin Algase, Herbert M. Singer,* and *Herbert L. Barnet,* all of New York City, on the brief), for complainant.

*Robert H. Richards* and *Caleb S. Layton,* of the firm of Richards, Layton & Finger, and *Whitney N. Seymour* and *Francis X. Fallon, Jr.,* of the firm of Simpson, Thacher & Bartlett, of New York City, for defendants.

THE CHANCELLOR: The complainant will be herein referred to as Loft, the defendant Pepsi-Cola Company as Pepsi and The Grace Company, Inc. of Delaware, as Grace.

Guth became a director and vice-president of Loft on or about July 27, 1929. He was elected and became a director and the president of Loft on March 20, 1930, and continued in both capacities until October 21, 1935. On that date he resigned as president after serious differences arose between himself and a majority of the other directors and

after many of the five thousand employees of the company went on a strike.

Guth is for all practical purposes the owner of Grace. When reference is herein made to Grace it is as though the mention were of Guth.

Guth and Grace are the holders of about ninety-one per cent of the issued stock of Pepsi, which was incorporated on August 10, 1931. The complainant contends that said stock equitably belongs to it. The bill seeks its recovery. Three principal blocks of stock go to make the total sought to be recovered. They consist of one hundred thousand shares issued by Pepsi to Grace on or about September 14, 1931, in accordance with the terms of the contract hereinafter referred to between Guth and Roy C. Megargel dated July 23, 1931; ninety-seven thousand five hundred shares acquired by Pepsi on or about January 1, 1934, in the so-called Megargel settlement and by Pepsi subsequently transferred to Guth; and forty thousand shares acquired by Grace in December, 1934, in settlement of Pepsi's open account indebtedness to it at that time of $46,286.49.

Loft claims that these shares together with all gains and profits which either Grace or Guth has derived therefrom, belong to it.

The nature of the complaint which the bill makes was stated by me on the occasion when exceptions to interrogatories were disposed of (21 *Del. Ch.* 361, 191 *A.* 879, 881), as follows:

"Briefly described, the gravamen of the bill is that Guth while he was the president and the controlling influence in Loft, Inc., caused a certain very desirable business proposition which was made to him as the president of the complainant, to be diverted from the complainant to a newly formed corporation, the defendant Pepsi-Cola Company, most of the shares of the capital stock of which he and his personal holding corporation, the defendant The Grace Company, acquired.

"The business referred to is that of manufacturing a syrup and carbonated beverage made therefrom, known as 'Pepsi-Cola' which

is marketed under a trademark of that name—a syrup that is compounded by a secret formula. The trademark and formula were acquired by Pepsi-Cola Company from one Megargle who, the bill alleges, approached Guth as president of the complainant, with a proposition that the business of exploiting the beverage be entered upon by the complainant.

"The bill alleges that the complainant was equipped with facilities for both the wholesale manufacture of the drink and its distribution through a large chain of stores in which the complainant sold candies and soft drinks, etc., and other food products for consumption by the public.

"It is further alleged by the bill that the complainant was financially able to engage in the proposed new business and make the same successful.

"Notwithstanding the attractiveness of the proposition, and that the complainant possessed the manufacturing and wholesale and retail facilities, and the financial resources to carry it through, the bill charges that Guth did not submit the proposal to the directors of the complainant for their consideration. He is charged with having personally appropriated to himself the opportunity which Megargle's suggestion offered, and to have thereby succeeded in acquiring large profits and gains.

"Not only did Guth thus abuse his power to his own advantage to deprive the complainant of the opportunity of embarking upon the profitable Pepsi-Cola business, but, the bill alleges, he went further in profiting himself at the expense of the complainant. He caused the complainant's laboratories and other plant facilities to be used, the time of its employees to be spent, in the manufacture of Pepsi-Cola syrup, its credit to be employed in the purchase of materials and ingredients entering into the finished product, and its many stores to sell and advertise Pepi-Cola in place of the established soft drink known as Coca-Cola, thereby measurably popularizing the new beverage. These things, the bill charges were all done at the expense of the complainant and without profit or advantage to it.

"The result, the bill alleges, is that Guth and The Grace Company, which he and members of his family own, are in possession of many shares of stock of Pepsi-Cola Company which are of great value and which, by reason of the foregoing brief sketch of facts, ought in equity be decreed to belong to the complainant, subject of course to all proper charges found on an accounting to be due to the defendants."

In 1931 Loft operated one hundred and fifteen stores largely located in the congested centers of population along the Middle Atlantic seaboard. The preceding year it acquired the so-called Happiness and Mirror chains of stores. When the bill was filed it operated about two hundred stores. These stores sold at retail candies, confections, ice

cream, carbonated and other soft drinks and other food products such as are to be had in light lunch establishments. It engaged also in a wholesale candy business. It had a large manufacturing plant at Long Island City, New York, where it manufactured candies, ice cream and fountain syrups, and prepared most of the articles of food which it sells in the stores. It was a substantial company with assets having a value in 1931, exclusive of goodwill, of nine million dollars. Its net asset position was amply sufficient to finance the Pepsi-Cola enterprise.

Loft was a large consumer of Coca-Cola syrup which when mixed with carbonated water produces the nationally known and popular drink called "Coca-Cola." There is evidence in the record which shows that Loft during the years 1929, 1930 and during eight and one-half months of 1931, purchased an average of 31,584 gallons of Coca-Cola syrup per year. It dispensed Coca-Cola in the form of the carbonated beverage over the fountains in its stores at five cents per glass. The cost to it for the syrup was about $1.48 per gallon.

Guth as president of Loft thought that the Coca-Cola company ought, in view of Loft's large consumption of its syrup to give to Loft a jobber's discount. This, the Coca-Cola Company refused to do. Numerous conferences were had between Loft representatives, principally Guth, and Coca-Cola representatives. The controversy over price caused a sense of grievance on Guth's part.

As a result, Guth considered the advisability of Loft's dropping Coca-Cola from its merchandising and supplanting it with some other so-called cola drink.

Accordingly on May 19, 1931, we find a memorandum addressed by Guth to V. O. Robertson, Loft's vice-president, as follows: "Mr. Robertson: Why are we paying the full price for coca-cola? Can you handle this or would you suggest our buying Pebsaco (Pepsi-Cola) at about $1.00 per

gallon? C. G. G." On May 30, 1931, Robertson replied: "We are not paying quite full price for Coca-Cola. We pay $1.38 (*sic.* should be $1.48) instead of $1.50 (*sic.* should be $1.60) but we pay too much. I am investigating as to pepsi-cola. V. O. R."

When Guth's memorandum of May 19, 1931, was written Pepsi-Cola syrup was being compounded and marketed by National Pepsi-Cola Company, a company which Megargel controlled. The Pepsi-Cola beverage had been on the market for twenty-five or more years. It appears, however, to have been localized in its sales in the southern part of the country. It was not known in the consumers trade in the area where Loft's stores were located. Coca-Cola was the popular and well known cola drink in that area. Many millions had been spent on popularizing it. For any strange cola beverage to try to supplant or to compete with Coca-Cola in popular demand would be an exceedingly ambitious undertaking. Yet Guth considered making the try so far at least as the Loft trade was concerned.

It so happened that on the very day before Guth's memorandum to Robertson, viz., on May 18, 1931, a petition in bankruptcy had been filed against Megargel's National Pepsi-Cola Company, and on May 26, 1931, an adjudication was made.

Now back in 1928 Megargel had endeavored to interest Guth in the National Pepsi-Cola Company. Guth looked into it. Guth talked at that time with Hoodless, vice-president and general manager of the Pennsylvania Sugar Company, about Megargel's proposition. Guth and Hoodless decided to drop the matter. They did so, not temporarily as the solicitors for the defendants say, but so far as the evidence shows, permanently.

When Megargel's company became bankrupt three years later, it appears that Hoodless, who must have had some talk with Megargel, communicated by telephone with

Guth and informed him that Megargel was going to get in touch with him. Megargel called Guth and informed him that the National Pepsi-Cola Company had gone into bankruptcy and that he was in a position, through the trustee appointed by the federal court in Richmond, Va., to acquire the assets, trademark, goodwill and formula of the company.

It was from this talk of Megargel's with Guth that the developments were initiated which, with their train of subsequent events, supply the basis for the pending suit.

Mergargel and Guth entered into an agreement on July 23, 1931, the substance of which was as follows: Megargel would acquire the Pepsi-Cola formula and trademark. (He got them for $12,000.) A new corporation would be formed having an authorized capital issue of three hundred thousand shares. Megargel would transfer the formula and trademark to the corporation in consideration of the issuance to him of all its capital stock. Megargel would keep one hundred thousand of the shares, transfer one hundred thousand to Guth, and turn the remaining one hundred thousand shares back to the company as treasury stock, all or part of which was to be sold to raise fifty thousand dollars as the company's working capital. Guth and Megargel visualized an annual sale of syrup of one million gallons. Megargel was to receive a royalty of two and one-half cents a gallon, or an estimated twenty-five thousand dollars per year. For the first six years, I think it was, Megargel was to receive at least twenty-five thousand dollars per year, and thereafter his compensation was to be on a straight royalty basis of two and one-half cents per gallon.

As the result of this agreement, the defendant Pepsi was organized on August 10, 1931, with an authorized capital of three hundred thousand shares each of the par value of five dollars. Megargel assigned the formula and trademark to Pepsi and distributed the three hundred thousand

shares which he received therefor as he had agreed to do. He transferred Guth's one hundred thousand shares to Grace (which was really Guth), kept one hundred thousand shares and turned one hundred thousand shares back into the company's treasury.

Now it is apparent that before Guth embarked on his negotiations with Megargel he was working on the proposition of having Loft install the Pepsi-Cola beverage in its stores in place of Coca-Cola. The date of his memorandum to Robertson conclusively establishes that fact. That memorandum was dated May 19, 1931. He negotiated with Megargel after the bankruptcy which was adjudicated on May 26, 1931.

Thus there came to a head at about the same time, viz., in May, 1931, Loft's serious consideration of the installation of Pepsi-Cola in its stores and the bankruptcy of the company that manufactured it, the former preceding the latter. It is the contention of Loft that the opportunity to acquire the Pepsi-Cola formula and trademark and to manufacture and sell the syrup, arrived at that particular juncture when the acquisition would fit exactly into Loft's problem of ejecting Coca-Cola from its stores and installing Pepsi-Cola in place thereof; that Loft was amply able to make the acquisition and to conduct the manufacture; and that Guth, who as president of Loft decided for it upon the policy of adopting Pepsi-Cola as its cola beverage, proceeded to arrange matters so that while his company might secure a sufficient supply of Pepsi-Cola syrup to carry out the policy, it should, however, be deprived of the opportunity, which he himself would take, of acquiring the business of its manufacture and supply.

Much has been said upon the question of what was Megargel's purpose in bringing to Guth's attention the Pepsi-Cola proposition—whether he was making his offer to Guth as president of Loft and so in its behalf, or to Guth

individually. We do not have the benefit of Megargel's testimony with respect to the matter. He is dead. That he was aware of the great advantage which would be gained by having Loft install the drink in its stores both in the way of immediate sales and in the important particular of publicizing and popularizing it in a large consuming area, seems entirely likely. He made some mention of the advantage which would accrue to Pepsi-Cola from its introduction in Loft's stores. This was self-evident. Whether, however, Megargel meant to make his offer to Guth in his role of Loft's president, or to him individually, we have no way of knowing. Nor do I think it is important to know. The important question is—how did Guth receive the offer? That he gave to the transaction with Megargel the outward appearance of a transaction in which he as an individual was solely interested, is evident.

But equity is not beguiled by appearances. The outward show and trappings of things give no necessary assurance of their true nature. If it be true, as the complainant contends, that when Guth embarked Pepsi upon its operation, he so arranged matters that Loft executives, Loft personnel, Loft equipment, Loft facilities, Loft merchandise, Loft money, Loft credits, supplied substantially all the resources that enabled Pepsi to conduct its business, it must be clearly apparent that so far as Guth could by his acts impress a character upon the enterprise, he gave it the character of a Loft undertaking. In such case he would be estopped to deny what his acts demonstrated, viz., that what he had appeared privately to own was in fact acquired by him for and was the property of the company of which he was president and whose resources he as president dedicated to its promotion and development. *Bailey v. Jacobs,* 325 *Pa.* 187, 189 *A.* 320.

I now turn to the evidence to see if it be true, as contended by the complainant, that Loft was in every essential respect the real supplier of the resources that made the

Pepsi business. The evidence bearing on this important question is exceedingly voluminous and the exhibits run into the hundreds. I must content myself largely with summarizing its effect and with touching briefly upon some of its significant features.

In the first place, that Loft was amply able to finance the new Pepsi undertaking is demonstrated not only by its financial condition, its plant, equipment, executives, personnel and facilities existing at the time (supplemented with such expansion which Loft was well able to provide for, as development of the business might require), but as well by the fact that in reality it did so in every substantial respect from 1931 to about the end of 1934, when Pepsi, because of the then established success of its business, was able to take care of itself.

Certainly if Guth, his Grace Company and Pepsi were able to finance the new venture, Loft was able to do so, because the evidence shows that if the former combined all their resources, the total would be relatively trifling when laid beside those which Loft possessed. The evidence shows that their total was wholly inadequate to finance the new venture. Loft's resources financed it.

As to the sugar purchases by Grace on credit, which the defendants refer to as obtained on Guth's guarantee, this is to be said. The credit was very brief. If Grace and Guth with their practically negligible resources could get the sugar on brief credit, Loft with its increasingly greater resources would have been the more able to do so. In fact Guth considered having Loft acquire a sugar refinery in Cuba. Furthermore, during the period when Grace most needed the short time sugar credit, Loft was practically the sole purchaser of syrup (at a substantial profit to Pepsi) and was extending long time credit to Grace for merchandise which entered into the syrup. What Pepsi was paying to Grace was from the cash received by it on its

sales to Loft. Thus Loft was supplying to Grace in one way or another a working turnover as the base for sugar credits.

It is now in order to notice some of the details in which Loft supplied the resources for Guth to inaugurate and to establish the business of Pepsi on a solid foundation.

Megargel needed twelve thousand dollars with which to purchase the formula and trademark. Guth supplied him the money. But seven thousand dollars of the amount, he secured from Loft. There is no pretense that the directors authorized the loan. To be sure, Guth gave his check to Loft in exchange for its seven thousand dollar check. But as Loft's check was certified and Guth's was not, the period of two or three days during which Guth's check was in course of collection represents a credit of that many days which he caused Loft to extend to him. At that very time he was indebted to Loft on the so-called Carey note (which really was for his benefit) in the sum of two hundred and six thousand dollars and on open account in the sum of about fifteen thousand dollars. At the same time he owed Loft thirty thousand dollars in the Chocolate Products Company matter hereinafter referred to. Now in defense of this seven thousand dollar withdrawal, two things are said in defense. First, that it was only for two or three days. Well, I do not see by what right a president who is in absolute control of a corporation, as I think Guth was in this case, can order corporate funds to be advanced to himself for any period however short. For him to do so, is indefensible. The corporation's moneys are not his. Courts have said the brevity of the credit to the officer does not give propriety to its extension. Second it is said, that when the seven thousand dollars was taken, Loft was indebted to Guth on account of compensation in the sum of $47,-802.59. But it is not pretended that the seven thousand dollar check was issued in partial liquidation of the compensation account. If a balance were struck between Guth's

indebtedness to Loft and the latter's to him when the seven thousand dollar sum was withdrawn, it would leave Guth the debtor in a very substantial amount.

The advance by Guth to Megargel of twelve thousand dollars with which Megargel acquired the formula and trademark is treated by the defendants and at times by the complainant as though it were a contribution by Guth to the capital of Pepsi, because Megargel assigned the formula and trademark to Pepsi in consideration for its stock. I do not see the propriety of calling the twelve thousand dollars which Guth advanced to Megargel as a contribution by Guth to the capital of Pepsi. It was a loan by Guth to Megargel personally. Megargel's receipt shows that. He agreed to repay it to Guth out of the first annual twenty-five thousand dollars he was to receive from Pepsi and he made a formal assignment to Guth to that effect. Thus Pepsi as debtor to Megargel was to repay to Guth the twelve thousand dollars. This it later did.

The evidence shows that even if the twelve thousand dollars advance by Guth to Megargel be regarded as a contribution by Guth to the capital of Pepsi, yet after Guth was repaid by Pepsi, he did not have a dollar of his own money invested in the Pepsi Company. (I have ignored the $426.40 he paid for chartering costs and the one thousand dollars advanced by him on a latter occasion to Megargel. These were repaid to him by Pepsi.) Guth owns about ninety-one per cent of its stock, but he has nothing invested in it. If it be said that he invested his services in it, the appropriate reply is that he was the full time president of Loft on an attractive employment contract, that he attended to Pepsi business concurrently with Loft business and in Loft's offices, using the services of other Loft executives and employees, who were paid by Loft on Pepsi business during their working hours.

The only money that was ever in the Pepsi capital ac-

count after Guth's loan to Megargel was paid, was derived from the sale of stock to others. These sales yielded I believe about thirteen thousand dollars only. Yet Pepsi syrup sales from 1931 to 1933 amounted to something over one hundred thousand dollars.

Now how could Pepsi, a new company, do a business of that volume on about a thirteen thousand dollar cash contribution to its capital, with the extraordinary costs any new company, especially a beverage company, is subject to in the initial stages of its business? The answer is that Loft bore the weight of Pepsi's financial burdens, practically the entire weight, from its inception in 1931 to the time it turned the corner in about July, 1934. The following brief review of the salient facts demonstrates this.

Loft supplied Pepsi with executive management. I have already referred to Guth and Robertson, president and vice-president respectively of Loft. The evidence shows both of them to have been as fully attentive to Pepsi's business as they would have been if that business were their sole concern. Guth's private secretary, Miss Castle, used a Loft room as Pepsi's office, adjoining Guth's. She was active in performing services for Pepsi. The executive direction of Pepsi's affairs was by Loft's executives, on Loft's time and from Loft's offices. The so-called daily reading files which were compiled for and circulated among Loft's principal officers showing the problems of Loft as reflected in the correspondence of the day, contain numerous documents that pertain to Pepsi's business. Miss McEvoy, whose desk was close to Guth's appears to have been an important personage in Loft's office operations. She had complete control over Loft's accounts payable and accounts receivable. At the same time she was the secretary and treasurer of Pepsi. She signed checks for Pepsi including its payroll payments, signed Pepsi's contracts, received and checked reports from the Pepsi-Cola plant manager at Atlanta, and supervised its correspondence. A vast amount of Pepsi

business came to her desk. Pepsi's mail was handled in Loft's post office department, Loft furnishing the postage. Loft's paymaster, Tucksmith, made up Pepsi's payroll until 1935. Pepsi's payroll sheets were part of Loft's, and a single Loft check was drawn for both payrolls. Guth used Burns, a wholesale candy salesman for Loft, to spend days and weeks in working up sales for Pepsi. Guth commandeered, rent free, Loft's garage to be used as a temporary bottling plant for Pepsi, during the period in the summer of 1934, when Pepsi terminated the bottling contract it had with Mavis Bottling Company and leased the Mavis plant in order to conduct its own bottling therein. Pending the fixing up of the Mavis plant and its equipment for rather large scale bottling operations on Pepsi's own account, Guth, as stated, utilized Loft's garage as a temporary bottling plant, having a capacity of about eight hundred cases a day. Loft's mechanics, its machinists, electricians, carpenters, painters and laborers, supplied the labor in converting the garage into a bottling plant, and Loft bore the expense of supplying all the machinery and the necessary materials and equipment therefor. The work of cleaning up and renovating the Mavis plant, painting it, repairing it, and installing the machinery was done by Loft's mechanics and laborers. An attempt was made to keep an account of the time spent by the mechanics and laborers on these various Pepsi activities and Pepsi finally, after it came into profits, viz., in 1935, repaid Loft therefor according as the indebtedness was shown by the accounts. No charge however was ever made against Pepsi for the valuable services rendered by Loft's executives, higher ranking office employees and foremen (with one exception) for the time they spent in connection with the numerous Pepsi matters to which they devoted themselves.

When Pepsi started business it completely lacked any executive force of its own to direct its affairs. The office which it later acquired in the Empire State Building was

no office in the true sense of the word. It might best be described as a window dressing affair. To all intents and purposes, Pepsi, until it got to making money three years after it started business, so far as its executive, managerial and office activities were concerned, was centered in the Loft establishment and was run as though it were a department of Loft's business. It is impossible to estimate the value of the services which Loft thus rendered for it. If Pepsi had been required to do for itself what Guth caused Loft to do for it in the first three years of its existence, it is doubtful if it could have kept itself afloat for more than a few months of time. Indeed even with all the aid and support it received from Loft, consisting of executive management, services of employees and foremen, office and plant facilities, cash advances and credits, advertising, etc., when the latter half of 1933 arrived, Pepsi was in a condition of undoubted insolvency.

Ritchie was in charge of Loft's laboratory, testing and chemical work. An attempt was made to depreciate Ritchie and to minimize the value of his services to Pepsi. I saw him on the stand and heard him at great length under direct and searching cross-examination. He made a most favorable impression upon me as an honest and intelligent young man. Now what did he do for Pepsi while he was in Loft's employ and in its sole pay? In the first place under orders from Guth, he compounded a drink, according to the formula which Pepsi had acquired from Megargel. The drink was pronounced unsatisfactory. Guth then instructed him to experiment with the formula with the view of producing a drink which would bear a competitive resemblance to coca-cola. Ritchie spent about two or three weeks as I recall trying out different changes in the formula. When he thought he had a result which was satisfactory, he notified Guth who said it was about right. This was in August, 1931. Ritchie then was put to work, using Loft's laboratory and equipment, producing the so-called merchan-

dise necessary to make the syrup and placing it in various containers conveniently marked to harmonize with the mixing instructions which Ritchie prepared. The merchandise when put together, would constitute what for convenience I shall call the concentrate, which when the proper proportion of sugar and water was added thereto would constitute the Pepsi-Cola syrup. The addition of carbonated water to this syrup would produce the beverage Pepsi-Cola.

Ritchie drew from Loft's inventory such materials as Loft had on hand for its own manufacturing purposes and bought through Loft's purchasing department, Loft being charged therewith, such materials as Loft did not carry in stock. With these materials he compounded the secret flavoring ingredient and prepared the merchandise known first as one, two, three, four, five, six and later as A, B, C, which were necessary to make the syrup. He shipped the merchandise (among which was included the flavoring ingredient bearing one of the designating numerals or letters), with instructions for mixing with sugar and water, to Grace in Baltimore. Loft charged Grace's account for the actual cost of the materials plus ten per cent. Grace made the syrup and sold the same to Pepsi. Pepsi had an office at the Grace plant. Books were kept there. The syrup was shipped from there to Pepsi's customers. Grace was Pepsi's exclusive source of syrup supply from 1931 to about August, 1935, except for what syrup Loft made for Pepsi after about the middle of 1934. About August, 1935, Pepsi having finally arrived at success, began to make concentrate and syrup for itself.

Ritchie in the employ of Loft prepared all the concentrate that Grace or Loft or Pepsi used and all therefore that went into Pepsi's syrup until the end of 1935. Ritchie prepared such merchandise or concentrate as Pepsi needed for the plant in Atlanta when it was trying to build up a bottling business. He made trips to Atlanta, Philadelphia

and Montreal in the interest of Pepsi's business, that is to say, that part of it which was concerned with the making of the concentrate and the supervision of its mixture with sugar and water to produce the syrup.

Guth caused Loft to make cash advances to Pepsi running into thousands of dollars for various purposes including the acquisition of bottling plants in Montreal and New Orleans and the purchase of bottles, the last named item itself requiring over twenty thousand dollars of Loft money.

Incidentally Loft's store facilities and its employee personnel in New Orleans, as at Loft's large plant in Long Island City, were availed of by Guth to make the syrup down there and to promote its sale.

Nothing was ever paid by Pepsi for Ritchie's services. Not only did Ritchie render the valuable services just referred to in the important matter of assembling, testing for quality and putting together the ingredients for the concentrate, but when Pepsi started to bottle the beverage in the converted Loft garage in 1934, he manufactured the finished syrup in sufficient quantities to supply Pepsi's own bottling needs. The syrup was made in the Loft laboratory and piped through a specially constructed line down to the converted garage. Not only so, but when Pepsi moved its bottling business over to the newly equipped Mavis plant which it had leased, Ritchie, working in the Loft laboratory on Loft's time and with Loft's facilities and Loft's merchandise ingredients, made all the concentrate necessary to supply the syrup needs of the new plant until about August, 1935. He testified that he went over to the new plant in August of 1935 and laid out and installed its syrup producing unit. He spent seventy-five per cent of his time on Pepsi's business at the Mavis plant from August, 1935, to the following December. This was all at the expense of

Loft. At the Mavis plant he superintended the making of the syrup.

I now come to the matter of what the complainant, not without justification, is pleased to refer to frequently as the "merry-go-round." As before stated Loft made the ingredients which, when put together, constituted the concentrate or merchandise, as they are often described. These ingredients were packaged as before mentioned in a way that was convenient for mixing, which required no particular skill—just faithful following of Ritchie's simple directions. The work of compounding that particular one of the merchandise units which gave to the drink its distinctive character, viz., the flavoring ingredient, was entrusted to Ritchie alone. The numerals 1, 2, 3, 4, 5 and 6, and later the letters A, B, C, were used in designating the packages in the interest of secrecy as well as convenience in the final mixing. When merchandise was desired by Grace for the making of syrup, it was made by Ritchie at the Loft plant and put in the course of shipment to Grace at Baltimore. All that Grace had to do with it in order to produce the syrup, was to add sugar and water in the proper proportion as called for by the mixing directions.

Loft charged Grace for the merchandise at actual cost plus ten per cent. Labor and overhead did not enter into the cost. During the period of 1931-1935 when Loft was supplying the concentrate at first to Grace and later (last part of 1934 to August, 1935) to Pepsi, the average cost to Loft, exclusive of labor and overhead of the amount of concentrate necessary to produce a gallon of syrup, was about $.1047. The average price of its billings to Grace and later to Pepsi was $.126. This is about $.01 in excess of cost plus ten per cent. The complainant has made a calculation by which the endeavor is made to show the additional cost that should be added for labor and overhead. I shall not pause to examine that calculation. If it be correct, it shows the true cost to Loft of sufficient concentrate to

make one gallon of syrup was not less than $.133. If that be so, Loft made no profit whatever on the concentrate it sold to either Grace or Pepsi—it suffered a loss.

Now when Grace received the merchandise for the concentrate from Loft, all that it had to do was to add sugar and water to produce the syrup. The necessary sugar additions appears to have averaged a cost of about $.27 per gallon of syrup. Having made the syrup, Grace billed it to Pepsi during the years 1931-1933 first at $2.60 per case and later at $3.15 per case of #10 tins. This was at a profit to Grace, the figure of which I have been unable at the moment to locate in the mass of testimony, exhibits, tables and briefs before me. By December, 1934, the account between Grace and Pepsi showed an indebtedness by Pepsi to Grace of $46,286.49. This was almost entirely, if not entirely, for syrup.

Pepsi having been billed for the syrup which was made by Grace from concentrate supplied by Loft, but the syrup still remaining at the Grace plant, proceeded to sell the same. It was shipped from the Grace plant to Pepsi's customers, the chief of whom was Loft. During the years 1931-1933 Loft and its candy agents, whom Burns of Loft solicited, purchased over fifty per cent of Pepsi's syrup sales. But Pepsi added a rather ample margin of profit. Complainant has made a calculation of this profit and claims it to be $18,285.56 on sales of syrup in #10 tins alone to Loft. The defendants dispute the correctness of the tabulation. I refrain from going into the details of the argument touching its correctness. It is sufficient for me to say that in my opinion the complainant is approximately correct in its computation.

Thus when Loft started the concentrate on the circuit from itself to Grace, which, after adding sugar and water, billed it to Pepsi which in turn passed it on back to Loft, its place of beginning. Loft appears to have lost over eight-

een thousand dollars by the operation, and Grace and Pepsi to have profited at Loft's expense at least to that extent, the operation itself being made possible by Loft's momentarily gratuitously supplied financial and material resources and its personnel and facilities.

This was what the complainant refers to as the "merry-go-round" by which the concentrate made by Loft at its expense was carried around a circle back to Loft with sugar and water added, at an expense to Loft and a corresponding profit to Grace and Pepsi, the operation incidentally assisting Pepsi to extend its business into other fields.

Now how were payments made on these inter-company transactions which Guth as president of Loft, Guth as owner of Grace and Guth as a large owner of Pepsi directed? As between Loft and Grace, Grace was extended credit by Loft, throughout a three and one-half year period during which nothing was paid thereon. As between Grace and Pepsi, the latter paid for the syrup on account, always owing a substantial balance however, which in December of 1934 amounted to $46,286.49.

But as between Loft and Pepsi, Loft paid Pepsi for the syrup purchased by it as the same was delivered from time to time in no case longer than in thirty days and in one instance in advance. During the years 1931, 1932 and 1933 Loft's purchases of syrup from Pepsi totalled in dollars $50,300.80, nearly one-half of Pepsi's total sales. Now all the concentrate that was necessary to make not only the syrup that Pepsi sold to Loft but as well to all others, was supplied by Loft to Grace on long term credit. At the end of the three and one-half year period of credit, Grace owed to Loft for merchandise entering into the concentrate $55,-214.00.

Thus in the three cornered dealings between Loft and Guth's two companies, Grace and Pepsi, financial life blood

was supplied to Grace by Loft in the form of the long term credits which outstood in Loft's favor, and the business of Guth's two companies, Grace and Pepsi, was thereby nourished and sustained. Loft paid cash to Pepsi for the syrup, but received no cash from Grace until after the profits of Pepsi's business supplied the means of payment.

Not only was the foregoing true, but Loft also made substantial advances in one form or another to Pepsi. By June 30, 1934, Loft's advances to Pepsi totalled $74,871.28. Loft also made advances to Grace. On June 30, 1934, the total cash and credit advances from Loft to both Pepsi and Grace equalled $102,322.41.

Loft spent, according to Guth's admission, twenty thousand dollars in advertising the Pepsi-Cola beverage. It never had to spend anything in advertising Coca-Cola. I think that under the circumstances of this case, any advertising expense that Loft incurred in popularizing Pepsi-Cola is properly to be regarded as an expenditure in Pepsi's interest.

Loft contends that it was put by Guth to an expense in a negative sense, in and about the business of promoting the interests of Pepsi. The contention in this connection is that Guth, by compelling Loft to introduce Pepsi-Cola in the Loft stores in place of Coca-Cola, caused Loft to suffer a loss in profits of a considerable sum of money. Interesting tables and calculations have been placed in evidence which show the profit which Loft made on Pepsi-Cola sales from 1931 to 1935 and the profit which would have been made by Loft during the same period on Coca-Cola, if it had been retained at the Loft Stores, and had continued to be sold in the same quantities as it had been sold during the years 1929, 1930 and eight and one-half months of 1931, at the end of which period Pepsi-Cola took Coca-Cola's place. The solicitors are at odds over the reliability of these tables. Their differences, however, are not over the mathematics

of the tables. The differences are concerned with the principle on which the tables are constructed. The point of difference is that the tables assume that the yearly average of Coca-Cola sales would have continued after 1931 as it had before. I do not see why the average would not have so continued, at least substantially so, especially since the volume of Loft's merchandise sales generally continued after 1931 about as it was before. Now on the assumption that Loft would have sold as many Coca-Cola drinks during each of the years 1931-1935 as its prior experience indicated it should, the loss in profits which Loft suffered by installing Pepsi-Cola in place of Coca-Cola, totalled, for the four years, three and one-half months, $322,631.27, according to the complainant's calculations. (In calculating this loss, the complainant has translated gallonage of syrup into five cent drinks, which should be done since the standard of mixture of syrup with carbonated water calls for one and three-eighths ounces of Pepsi-Cola as compared with one ounce of Coca-Cola to the glass.)

Whether the loss was that great, I am not prepared positively to say. Variable factors may run it down to some extent. That the loss was great, however, seems to be beyond question. It may have been that much. I do not see how it could in reason be expected that a beverage which was utterly strange to the area in which it was being introduced and therefore to Loft's customers, would be as fully accepted by the public as the long established and widely known Coca-Cola drink had been.

The date of June 30, 1934, is about the date when Pepsi turned the corner. From then on, its success developed in a most gratifying way. The preceding period of three years had been the period of its infancy, attended by all the hazards which invariably attend the early life of a new born business. Loft was forced by Guth into the position of Pepsi's foster parent, and now that it has ceased to need the attention and support of Loft, and has become

able to fend for itself, Guth seeks to repudiate the forced relationship which his prior acts had thrust upon Loft and to declare the child to be his own.

The extent to which Loft had contributed to the creation of the Pepsi-Cola business as of June 30, 1934, is shown by the following figures which are approximately correct. As of that date Loft had invested in the business through money advances to Pepsi and through credits for goods billed to Pepsi and to Grace (including $6,063.07 worth of goods which were delivered to but not billed to Grace) the total sum of $108,385.48. As against that contribution by Loft, Guth and his Grace Company had contributed practically nothing. Solicitors for the complainant calculate the total of the unrepaid and therefore existing contribution of Guth and his Grace Company at about twenty-five hundred dollars as of that date. In this calculation, however, they include Guth's advances to Megargel which, for the reason I have before stated, are seriously to be questioned as proper to be regarded as a contribution by Guth to Pepsi's capital.

The figure of $108,385.48 embraces only tangible items. They do not include the intangibles of services rendered by Loft through its executives and employees nor the use of Loft's offices, plant, equipment, facilities and credit, which latter was freely used as occasion called for.

Enough has been said without further review of the facts shown by this exceedingly voluminous record to demonstrate that it was Loft's resources which created the business of Pepsi. The shares of Pepsi stock which are outstanding are now of great value. Their value, however, is of course attributable solely to the business which they represent. Loft made that business. All the profits that flow to Pepsi are profits that flow from a business that was built and erected upon Loft resources. The evidence shows that neither Guth nor his company, Grace, was able at any

time to finance the Pepsi enterprise and keep it going. Reference is herein elsewhere made to Guth's personal inability to finance Pepsi. It is clear that Pepsi itself was totally unable to do so. Grace was equally incapable of doing the financing, for according to its own balance sheets at the year ending December 31, 1931, its assets exclusive of goodwill equalled only fifty thousand dollars against which liabilities outstood of about one hundred thousand dollars; at the end of 1932, its assets exclusive of goodwill totalled only forty-two thousand dollars against about one hundred and five thousand dollars of liabilities; and at the end of 1933, its assets exclusive of goodwill equalled forty-seven thousand dollars against liabilities of one hundred and fifteen thousand dollars.

Can it be that Guth who utilized his controlling position as president of Loft to compel it to engage in the creation and establishment of Pepsi's business, should be permitted to keep the evidences of title to its ownership, the shares of stock which either he or his Grace Company hold? Clearly, in my judgment, he cannot.

Guth was in control of Loft. He selected every one of its directors. From one of them, Dodd, he demanded and secured a resignation before admitting him to the board, subject to be accepted at any time. A majority of them were either officers or employees of Loft who were dependent upon Guth for the retention of their positions, or, as in the case of Driscoll and McBride, dependent upon Guth for the continuance of the financially profitable outside connection with Loft which they enjoyed. It is impossible for me to escape the conclusion that Guth was in an unquestioned position of dominance in the affairs of Loft. He had won control of the corporation after an intense and bitter contest for proxies from the stockholders in March of 1930. He is a man of great force and determination—one who having obtained control was not likely to relinquish a particle of it to others. With the exception of Patton and Dr.

Sullivan, who came on the board in 1930 and 1934 respectively, I doubt if there was a single director who would have ventured to question not to say oppose any action which Guth favored. Guth appears to me to have been allowed to handle Loft's affairs as though the corporation was the subject of his sole proprietorship. He had a free hand. The extent to which he availed himself of Loft's funds in advances to himself individually and devoted its resources to what he claims is, to the extent of about ninety-one per cent, his own personal company (Pepsi), emphasizes the absoluteness of his sway. There was a time when he had practically the entire working capital of Loft tied up in his personal affairs. Those of the directors who were on the board when the long series of acts now complained against were in course of perpetration, who are no longer on the board but are now associated with Guth in the Pepsi Company, presented themselves, I am bound to say, in a rather unenviable light when they came forward as witnesses to testify that they knew all about what use Guth was making of Loft's resources in developing the Pepsi business, that they knew Loft had no interest in that business except to get a cola syrup that was cheaper than Coca-Cola, and that they consented to an unlimited extension of credit from Loft to Guth in his Pepsi venture, when they knew at the same time that Guth personally was in financial straits and that his alleged company, Pepsi, was hopelessly insolvent. This minority group of former Loft directors whose profitable connection with its operation hung by the thread of Guth's favor, by their very testimony in exculpation of Guth, if it be accepted, demonstrate thereby the unrestricted dominance of Guth over the board and their own willingness to subordinate the interests of Loft to those of Guth and his individual enterprises. When they say that the board unanimously approved of allowing Guth unlimited scope in his use of Loft's resources to promote Pepsi business, Pepsi was confessedly an unadjudicated bankrupt. Guth himself was destitute of means to keep

Pepsi from collapse. So was his Grace Company. Yet these few directors who now rally to his support, were satisfied with Guth's unwritten guaranty, nowhere referred to in Loft's records, as Loft's protection in its advances for Pepsi-Cola purposes. If the defendants' contentions be accepted, it is apparent, perfectly apparent to me, that if Pepsi foundered on the rocks to which, in the absence of Loft assistance, it was headed prior to the summer of 1934, Loft would be the loser by thousand and thousands of dollars; but if it succeeded, all that Loft would receive from the profits which its assistance and advances made possible, would be the repayment of its actual material outlay, and the privilege of purchasing Pepsi-Cola syrup at a cheaper per gallon rate than that at which it could purchase Coca-Cola. But Loft would never be compensated for the highly valuable but uncalculable services of its executives, etc., which had contributed materially to the creation of the business, nor for the loss of profits which the ejection of Coca-Cola from its stores had entailed.

The privilege which I just mentioned was of doubtful value, because as heretofore stated it appears that consumer demand for Pepsi-Cola was, for a period at least, so far below the theretofore existing demand for Coca-Cola that Loft suffered a substantial loss in profits. But "privilege" is a misnomer, because no one has been able to produce an executed contract between Loft and Pepsi assuring the former of a constant supply for its Pepsi-Cola needs at a defined price. The evidence fails to satisfy me that there ever was such a contract. Pepsi, therefore, could at any time raise the price of syrup to Loft to the Coca-Cola price. What has become then of the alleged justification of Loft's tremendous financial risks in developing the Pepsi business, viz., the desirability of a continuous supply of Pepsi-Cola syrup at a favorable price, when it appears that in the sequel the great desideratum which the policy was intended to achieve was never assured? Incidentally it

may be mentioned that with respect to a number of customers of Pepsi, other than Loft, the evidence shows that a more favorable price has been given than Pepsi has afforded to Loft which, it is Guth's contention, was motivated to risk its resources on a vast scale in support of Pepsi solely because of what it considered an unjust price discrimination against it by Coca-Cola.

It has frequently been said by this court and clearly enunciated by the Supreme Court of this State in *Lofland, et al., v. Cahall, Rec'r.*, 13 *Del. Ch.* 384, 118 *A.* 1, that the directors of a corporation stand in a fiduciary relation to the corporation and its stockholders. Their acts are subject to be tested by the familiar rules that govern the relations of a trustee to his *cestui que trust*. In the *Cahall Case* the rule was announced to which dissent can nowhere be found, that "a director will be held as a trustee for the corporation he has undertaken to represent, and must account for the profits resulting from an unlawful act done to promote his own interest, because he cannot derive any personal benefit or advantage by reason of his position distinct from other stockholders."

Guth was not only a director of Loft. He was also its president. He was dominant in its affairs, so much so that the belief is warranted that in actual practice he handled its affairs and directed its management as though he were its sole proprietor. That the rule laid down by the Supreme Court in the *Lofland Case* is peculiarly and with exceptional force applicable to him, does not seem to me to admit of a shade of doubt.

A person standing in the fiduciary relation of a trustee for another is liable to account not alone for the bare value of the beneficiary's property which he took and utilized as his own, but as well also for all the gains and profits which he has derived therefrom. This is a thoroughly settled pro-

position and needs the citation of no authority in its support.

Such are the fiduciary duties and obligations of an officer and director of a corporation that if a business opportunity comes to him which is in the line of his corporation's activities and of advantage to it and especially if really intended for it, the law will not allow him to divert the opportunity from the corporation and embrace it as his own. If he does so, the corporation has a right to claim the benefits of the opportunity for itself and to impress the property which the director and officers received together with all profits thereon with a trust in its favor. *DuPont v. Dupont, et al., (D. C.),* 242 *F.* 98, reversed on the facts, but not on the law, (3 *Cir.*), 256 *F.* 129; *Averill v. Barber,* 53 *Hun* 636, 6 *N. Y. S.* 255; *Beatty v. Guggenheim Exploration Co.,* 225 *N. Y.* 380, 122 *N. E.* 378.

So far has this principle been applied that even if the corporation's board of directors has in good faith rejected the proposition for the corporation because in the judgment of the directors there is an inability on the part of the corporation to finance the proposal, yet the circumstances may be such as to deny permission to the directors as individuals to accept it for themselves even though they use their own funds exclusively for the purpose. *Irving Trust Co. v. Deutsch,* (2 *Cir.*) 73 *F.* 2d 121, *certiorari* denied *Biddle v. Irving Trust Co.,* 294 *U. S.* 708, 55 *S. Ct.* 405, 79 *L. Ed.* 1243. The proposal in that case was one for the acquisition by one corporation of stock in another corporation possessing patents which were useful to the former in its line of business. The corporation desired to acquire the stock. Whether it could finance the purchase was the only question that was open. The directors honestly concluded that the corporation was unable to do the financing and so could not take advantage of the offered opportunity. Thereupon the president of the company and other directors pro-

vided the financing and purchased the stock for themselves, honestly believing that by buying the stock for themselves they could give their corporation the advantage of access to the patents. But the court held that notwithstanding such were the circumstances, it was error for the court below to dismiss a bill which sought to hold the directors to an accounting (*Irving Trust Co. v. Deutsch*, (*D. C.*), 2 *F. Supp.* 971). The Circuit Court of Appeals in substance took the view that when the interests of the corporation are placed in rivalry with the personal interests of the directors, the danger that the latter may enervate the energies and warp the judgment of the directors in behalf of the former is so evident as to warrant a court of equity, at the instance of the corporation, in holding that what the directors as individuals did is to be regarded as having been done for their corporation, and that relief should be accordingly afforded to the corporation by appropriate accounting. The case is but one of a line of cases which are to be found in the books, which hold that when a conflict between duty and self-interest arises in the breast of a person holding a fiduciary relation, the only safe rule to adopt in the interest of the integrity of trust and *quasi* trust relations, is the rule that ascribes to self-interest rather than to a sense of duty the motive power of ensuing action.

The defendants state as a proposition of law that "where a business opportunity comes to an officer or director in his individual capacity rather than in his official capacity as an officer and director, and the opportunity is one which, because of the nature of the enterprise, is not essential to his corporation, and is one in which the corporation has no interest or expectancy, the officer or director is entitled to treat the opportunity as his own, and the corporation has no interest in it." The proposition, as stated, is in the main acceptable. In support of it, the defendants cite the cases of *Colorado & Utah Coal Co. v.*

*Harris Co.,* 97 *Colo.* 309, 49 *P.* 2d 429; *Lagarde v. Anniston Lime & Stone Co.,* 126 *Ala.* 496, 28 *So.* 199; *Pioneer Oil & Gas·Co. v. Anderson,* 168 *Miss.* 334, 151 *So.* 161; *Railroad Co. v. Stubbs,* 77 *Me.* 594, 2 *A.* 9; *Lancaster Loose Leaf Tobacco Co. v. Robinson,* 199 *Ky.* 313, 250 *S. W.* 997. While these cases support the proposition for which they are cited, they also recognize its converse as equally established. The complainant contends that it is not the proposition but its converse that is applicable under the facts of the instant case.   As indicated in *Pioneer Oil & Gas Co. v. Anderson,. supra,* cited by the defendants, whether a given case falls within the proposition or within its converse, it is impossible to determine by any hard and fast rule.   Each case is classified by its own individual facts.

An examination of the cases cited by the defendants will disclose that in all of them the fundamental fact of good faith was found in favor of the director or officer who was charged with dereliction.   In one or more of them it will also appear that the corporation was unable for one reason or another to acquire the property, or the matter of its acquisition was not of practical but of merely theoretical interest to it, or that the accused officer made no use whatever of his corporation's funds, or that the so-called expectancy which the defendant director embraced was not in the line of the corporation's business.   .

Now the evidence in the case *sub judice* does not warrant the view that any one of these features may be affirmed as existing here.   The brief review of some of its salient features which I have hereinbefore made, shows the opposite of every one of them to have been the fact. That Loft had the means to finance and establish the business is clearly demonstrated.   In every aspect of essential fact it did so. That Guth did not use his own funds and risk his own resources in acquiring and developing the Pepsi business is equally demonstrated.   He was in fact unable to do

so. I dismiss from consideration his claim of a parol contract of guaranty with Loft by which he engaged to save it harmless from any loss it might suffer from its advances. I conclude that no such guaranty was given. Even if it was, it was worthless. That the business of producing Pepsi-Cola syrup was in the line of Loft's business and of practical and not theoretical interest to it, is shown by the fact that Loft was engaged in manufacturing fountain syrups of numerous kinds to supply its own extensive needs. Indeed the outstanding justification which Guth offers for his utilization of Loft's resources on the scale he did, was Loft's need for a constant and reliable supply of Pepsi-Cola syrup. The former directors now allied with Guth, a minority of the former board, offer a like justification for their alleged approval of Guth's acts in plunging Loft deep into the Pepsi venture. It does not become either Guth or the minority group of directors now associated with him to claim that Pepsi was an enterprise which was foreign to Loft's purposes and alien to its business interests. The very claim, if accepted, denounces as a shocking breach of their duty as directors their act of agreeing, as they now say they did, to Guth's free use of Loft's resources of all kinds to an unlimited extent to promote and develop the enterprise.

I am of the opinion that under such circumstances as are disclosed in this case, Guth is estopped by what he subsequently caused Loft to do, to deny that when he embraced the Megargel offer he did so in behalf of Loft. The offer cannot be viewed in any light other than an expectancy that was Loft's. Guth is estopped to contend to the contrary. The case of *Bailey v. Jacobs*, 325 *Pa.* 187, 189 *A.* 320, cited at an earlier point in this opinion, is a pertinent and persuasive authority in support of that view.

But the complainant is not required to rest its claim to relief solely on the theory of a diverted and personally

appropriated expectancy. It may be conceded, but only *arguendo*, that when Guth received and accepted the Megargel proposition he did so in behalf of himself alone and not in behalf of Loft. Nevertheless I am of the opinion that since the business which was built on that proposition was built with the resources of Loft, it was, so far at least as Guth is concerned, in contemplation of equity the property of Loft. It was as much so as it would be if the property were a piece of real estate which Guth had unwarrantably taken Loft assets to purchase and had greatly profited himself thereby. Certainly in such case Guth would be held accountable not alone for the property into which he had converted his corporation's assets but as well for all profits made thereon. In this case what he acquired was shares of stock in Pepsi, a corporation which in point of actual fact was a mere shell of a corporation with practically nothing in the way of assets except a formula and trademark and the franchise as a corporation to engage in the work of erecting a business thereon. If the stock was ever to have value, it was only because a successful business enterprise would be later created to bring value to it. Loft's resources of every sort, tangible and intangible, were drawn upon to create the business that now underlies and gives all that is of value to the stock. A director and officer of a corporation cannot use corporate assets to finance his own individual projects and insist that the profit he derives therefrom is his own. *Bailey v. Jacobs, supra,* is a case particularly in point because of the analogy of its fact situation to the case at bar. Other cases which lay down the fundamental principle by which Guth must be held to the accounting prayed for are the following: *Blum v. Fleishhacker,* (D. C.) 21 F. Supp. 527; *Backus v. Finkelstein,* (D. C.) 23 F. 2d 357, appeal dismissed, (8 Cir.) 31 F. 2d 1011; *Bromschwig v. Carthage Marble & White Lime Co.,* 334 Mo. 319, 66 S. W. 2d 889; *Goodhue Farmers' Warehouse Co. v. Davis,* 81 Minn. 210, 83 N. W. 531; *Balch v.*

*Investors' Royalty Co.*, (*D. C.*) 7 *F. Supp.* 420; *Sparks v. McCraw*, 112 *S. C.* 519, 100 *S. E.* 161; *Barker v. Montana Gold, etc., Co.*, 35 *Mont.* 351, 89 *P.* 66; *Memphis & Arkansas River Packet Co. v. Agnew*, 132 *Tenn.* 265, 177 *S. W.* 949, *L. R. A.* 1916*A*, 640.

In cases of the type here in hand it is not necessary to show that the corporation suffered a loss by the transactions of the offending director-officer. The recovery which is sought is not for corporate losses suffered but for individual gains acquired. *Bailey v. Jacobs, supra; Bromschwig v. Carthage Marble & White Lime Co., supra.* Of course if the defendant director made and retained gains which were in fact the corporation's, the suit may in a sense be described as one to recover losses which the corporation had been compelled to endure. It is said by the defendants that Loft suffered no losses by what Guth did, but enjoyed a profit. If Guth's gains and profits really belong to Loft, as in my opinion they do, then the latter has endured a recoverable loss. By this statement that Loft suffered no loss but made a profit, the defendants mean that Loft secured a profit of ten per cent on its merchandise sales to Grace and Pepsi. When all factors are considered and the fact that no interest was paid to Loft for money advanced or for credits deferred, I do not think that the claimed profit to Loft exists. As before stated, Loft took all the risk of failure of the Pepsi venture and Guth enjoyed all the potentiality of reward that would attend its success. A fiduciary who profits at the expense of his trust, cannot justify his breach of duty by saying that his beneficiary did not suffer an out-of-pocket loss.

Such were the relations of Guth to Loft that the burden is on him to explain his transactions and to show that they were fair and that he took no advantage of his position as the dominant and controlling influence in the corporation. The presumptions are against him to the extent

at least of thrusting on him the duty of supplying exculpating explanation. *Geddes v. Aanaconda Copper Mining Co.,* 254 *U. S.* 590, 41 *S. Ct.* 209, 65 *L. Ed.* 425; *Sage v. Culver,* 147 *N. Y.* 241, 41 *N. E.* 513; *Continental Securities Co. v. Belmont,* 83 *Misc.* 340, 144 *N. Y. S.* 801, affirmed 22 *N. Y.* 673, 119 *N. E.* 1036.

It is said that Guth, Grace and Pepsi have paid back to Loft all that Loft ever advanced to any of them in the form of cash or merchandise credits. That appears substantially though not entirely to be true, with the exception of the item of thirty thousand dollars which Guth owes Loft in the Chocolate Products matter hereinafter referred to. I have before pointed out the extent of Loft's advances in various forms. The balances due to it were at all times exceedingly large in their ratio to the current volume of Pepsi business. They were also large when measured by an absolute standard. The accounts of Grace and Pepsi as shown by Loft's books were finally paid at about the end of 1935; but the payments were made out of profits which Pepsi had earned on the business that Loft's resources had been used to create. At the same time, the balance due from Guth on his personal money account with Loft which was then close to one hundred thousand dollars, was paid from the same source, viz., Pepsi profits. No payment to Loft was ever made for the contributions made by it to the Pepsi business consisting of executive management, office and clerical services, Loft prestige and credit, and the use of Loft plant and equipment. Had the repayment been in full and made out of funds which were entirely independent of the Pepsi business, that fact would not exonerate Guth from his liability to account. Much less can repayment serve to discharge the liability when, as was the case here, the repayment was from the profits that were equitably the profits of Loft. As I view the evidence, the so-called repayment to Loft was made from

Loft's own equitable assets. As was said in *Sparks v. Mc-Craw, supra,* "he could not pay his own debt to the corporation with money belonging to the corporation."

What Guth did cannot be viewed as having been done with the *bona fide* intent to render a benefit to Loft. The whole course of his conduct appears to me to reveal an intent to benefit himself alone, and this on the hazard of great loss to Loft.

But it is claimed that the directors were fully advised of the fact that Guth was deeply interested as an owner of Pepsi and of the fact that he was using Loft's organization, executives, employees, money, merchandise, credit, plant, equipment and facilities on the scale he did. I find otherwise.

It is claimed by Guth that he offered to Loft the opportunity to take over the Megargel proposal and adopt the Pepsi enterprise for itself, frankly stating to the board that if Loft did not embrace the opportunity for itself, he personally proposed to do so. Now whether Guth made this offer of the opportunity to Loft and accompanied it with a declaration of an alternative personal intention, is a question of fact upon which the witnesses are in pronounced disagreement. The offer is said to have been made to the board and rejected on several occasions, particularly in June and August, 1931. It would seem that a matter of this importance which involved the delicate question of the relations of the director-president of the corporation with itself, would have been the subject of a minute in the record of proceedings of at least one of the meetings where the defendants' witnesses say it was fully discussed and debated. But not one word is found in any of the minutes referring to the subject. The evidence to support Guth's contention in this regard is entirely dehors the corporate records. Now what is the evidence bearing on the subject? It consists of the statement by a minority (five)

of the board that Guth tendered the Megargel proposal to Loft, that the board declined to accept it and that Guth then declared his purpose to be to go forward with it on his own individual account. The former directors who so testify are now profitably associated with Guth in Pepsi-Cola activities. One or two of them have made their connection with him since this suit was instituted. Of the remaining seven directors of the then existing board, four testified. They are as positive in their testimony that Guth made no such tender and disclosure of personal purpose as his present associates are that he did.

Upon the question of whether Guth ever brought the Pepsi-Cola proposition to the attention of the directors of Loft, there is a lack of consistency in the averments of the original answer and the amended answer. In the original answer the defendants aver that Guth brought the matter "to the attention of the directors of Loft individually and in meetings of the board thereof and gave Loft the opportunity to acquire all or a part of the interest, etc." But in the amended answer the averment with respect to this matter is that Guth "did discuss the Pepsi-Cola situation with some of his fellow directors and officers of Loft at the time of and prior to the organization of the Pepsi-Cola Company," with no mention of a submission of the matter to a meeting of the board. The evidence adduced by the defendants, however, harmonizes with the averments of the original answer. Looking at the defendants' pleadings, therefore, as they progressed, and the evidence produced by the defendants at the trial, it appears that the defendants themselves have been by no means certain of the facts touching this particular factual phase of the case. This is the more remarkable because of the great importance they attach to the question of whether the directors in meeting assembled, rejected the proposal offered by Guth and because further of the fact which the evidence clearly reveals, viz., that the defendants' witnesses, including Guth

himself, now are able to relate from memory in great detail of circumstance the substance of all that was said at the meetings of the board. If the subject is now so clear to the recollection, I do not understand why it was so hazy, as it apparently was, as to occasion vacillation in its statement in the pleadings.

On the question of whether Guth submitted the offer of the opportunity to the directors of Loft, I find the fact to be contrary to Guth's contention. I am persuaded to so find not only because of the net substance of the testimony and the silence of the minutes but as well because of the opportunity I had to observe the demeanor of the witnesses on the stand and the very distinct impression I received of their respective reliability. I do not care to discuss in detail each witness. The undertaking would be neither pleasant as to some of them, nor on the whole desirable. I am of the opinion that Guth had resolved to take the Megargel proposition unto himself and that he did not give the board which was completely under his domination any opportunity to voice an opinion about it, further than to let them know that Loft ought to introduce the beverage Pepsi-Cola into its stores in place of Coca-Cola. To the installing of the beverage on the list of Loft's fountain drinks, no objection seems to have been voiced except from Patton who, while not objecting to introducing Pepsi-Cola, thought that Coca-Cola ought not to be discontinued. The directors then present were all in office by grace of Guth's favor, and all but one of them were in possession of lucrative positions or connections with Loft and permitted to continue so only by Guth's permission. That all of them except Patton (Sullivan did not become a director until 1934) were very much disposed not to oppose Guth in any program he laid down, is readily understandable.

The foregoing is by way of comment upon all the directors' meetings. Patton and Sullivan are exceptions to the rule. I do not recall that any witness, including Guth,

claims that at the meetings of June and August, 1931, Guth in addition to declaring his intention to accept the Pepsi proposition personally if Loft declined it, declared also that he proposed to utilize Loft's resources to carry it on.

It is claimed, however, that at meetings of the board held on subsequent occasions, Guth made disclosure of the facts showing his utilization of Loft's resources, and that the directors consented thereto and authorized a continuance thereof.

There was a meeting of the board in August, 1933. Before stating the defendants' account of what took place at that meeting, it should be said that the principal considerations which Guth and his witnesses advance as a reason for Loft's rejection of the Megargel proposal in 1931 were, that the Pepsi proposition had been a failure, that for Loft to sponsor a company to compete with Coca-Cola would be productive of trouble, that the proposition was not in line with Loft's business which in the main was the candy business, that Loft was not equipped to carry on the the Pepsi business on an extensive scale, and that for it to undertake to go into the business would involve too great a financial risk for Loft to assume.

When the directors met in August of 1933, it is claimed that Guth again offered to Loft to turn over the whole Pepsi business as it then was, if Loft would take over Guth's then position in the venture. He frankly confessed that Pepsi, which was then faced with a defenseless law suit growing out of a claim of Megargel under his contract, was, unless something could be done to rescue it from its existing plight, headed for bankruptcy. It was then insolvent. He confessed himself to be utterly unable to supply money to it, because his own financial affairs were in a rather desperate condition and his credit was exhausted. And so, he says, he offered to Loft the opportunity to take over his position in Pepsi in its entirety. He and the wit-

nesses associated with him claim that the directors again fully discussed the matter of Loft's going into Pepsi and canvassed all its aspects. The directors, they say, again refused Guth's proposition to have Loft go into the Pepsi venture, after full disclosure by Guth of his connection therewith, and with knowledge that Guth had been making use of Loft's organization and resources to finance the failing Pepsi enterprise.

But, according to Guth and his witnesses, the directors, though refusing to allow Loft to become interested in Pepsi as an owner, consented, without a vote however, that Loft should extend to Guth the use of Loft's resources of both materials, etc., and money, without limit, to the extent necessary for him yet to make a success of his Pepsi company. In view of this, I dare say, most extraordinary and unprecedented action, the inquiry naturally arises—what had become of the solicitude of the directors for Loft's financial welfare which back in June and August of 1931 had prompted the board to refuse to risk Loft's money in the venture? Then, viz., in 1931, the venture could at least claim optimistic forecasts in favor of success. But in August, 1933, complete failure was currently demonstrated. At the earlier date, however, prudence prevailed upon the directors to abstain from participation. At the later date, when prudence would have more forcefully suggested continued abstention, the directors, if we are to accept the version of the defendants, plunged Loft headlong and without limit into the tottering enterprise.

After the August, 1933, meeting, when the authority is claimed to have been given to Guth for an unlimited financing of Pepsi by Loft, a settlement was made of the suit against Pepsi based on the Megargel contract. That settlement called for a payment of thirty-five thousand dollars in cash by Pepsi. Guth provided five hundred dollars of this sum and Guth caused Loft to advance the balance of thirty-four thousand five hundred dollars. In the settle-

ment ninety-seven thousand five hundred shares of Megargel's Pepsi stock were received by Pepsi and left in the possession of Loft as security, it is claimed, for the advance. Thus Loft supplied all but five hundred dollars of the sum necessary to secure those shares. Guth now holds them. Pepsi's account with Loft was charged with the thirty-four thousand five hundred dollar advance, and finally repaid out of Pepsi's assets.

At the January meeting in 1934, the Megargel settlement, Loft's advance of the money and Pepsi's receipt of the stock, are said to have been reported to the directors. The directors are claimed to have again authorized the continuance of Loft's unlimited financing of Pepsi. No record of the authorization exists.

That some at least of the directors knew that Guth held stock in Pepsi is clear from the record. In fact three of them, besides Guth, owned Pepsi stock. But that the directors other than Guth knew that Loft was financing Pepsi is not only not clear, but is shown, I think, by the weight of the evidence to be not true. The majority of the persons then in office deny knowledge of Loft's advances in Pepsi's behalf. The minority group who by their testimony seek to give the impression that the board was officially or unofficially advised of Guth's use of Loft's resources to finance the Pepsi Company and that the board authorized the same, are flatly contradicted by the majority of their associates. I accept the version of the matter as depicted by the majority, viz., that the board was kept in ignorance of the situation with respect to the financing and never gave the authority which Guth now claims was conferred on him. The luncheon gatherings about which witnesses testified certainly were not board meetings. I am not impressed with any importance as attaching to those luncheons in connection, I mean, with the pending controversy. What mention was there made of Pepsi is easily referrable

to the beverage and Loft's progress with it as a substitute for the ousted Coca-Cola.

If Guth was given free access to Loft's resources in order to finance his private Pepsi project, as is claimed, the directors of Loft were guilty of a gross betrayal of their duty to the body of Loft stockholders. The directors had no right in either law or morals to thus devote Loft's assets and organization to Guth's individual uses. They offended not only against the inhibition of law in its general principles but as well against the statute under which the corporation was created in that one of its provisions (*Sec.* 36, *Rev. Code* 1935, § 2068) which forbids loans by a corporation to officers. The reprehensible character of their action in extending carte blanche authority to Guth to draw on Loft's resources to the full extent of his Pepsi needs, is not even mitigated by the weakly palliating circumstance that credit was extended to a man whose financial condition was such as to give any reasonable assurance of repayment. Guth was already indebted to the corporation on an open account for about forty-six thousand dollars as of December 31, 1933. During the period 1931-1935 he was in such financial plight that the banks were calling his collateral loans. He was borrowing on his insurance. Guth was drawing funds to pay off his bank loans and substituting Loft for the banks as his creditor. His borrowings from Loft, exclusive of the Carey note, reached as high as above one hundred and eight thousand dollars by June 30, 1935.

It was a person in this state of financial insecurity to whom the directors are claimed to have opened Loft's vaults and who was told by them to help himself. What do they who vouch for this extraordinary action advance in justification for the alleged act of the directors in thus dealing with the funds entrusted to their care as fiduciaries? Two things—first, that Guth guaranteed all the advances, and second, that Loft might have a continuous sup-

ply of Pepsi-Cola syrup at a favorable price. As to the first, the guaranty, its worthlessness in point of fact is demonstrated by Guth's financial circumstances and by the very need of the advances. The alleged guarantor appears himself to have been in need of a guarantor to sustain any credit. Furthermore, there is no evidence of a guaranty except from the parole testimony of a minority of those who are claimed to have heard it given. There is nothing in writing, and therefore the guaranty, if given by parole, would be confronted with the difficulty of the statute of frauds, or, if not, would certainly be confronted with difficulty in proof. I take no stock in this claim of a guaranty. As to the second justification, viz., the desire of Loft to secure a constant supply of Pepsi-Cola syrup at a favorable price, nothing need be said other than to repeat the substance of what I have before said, viz., that no contract exists between Loft and Pepsi for the supply of syrup either for any given length of time or at any particular price.

There was a meeting of Loft directors in December of 1934, at which it is claimed by the defendants that Loft was tendered by Guth the opportunity to purchase thirty-five thousand shares of Pepsi stock at one dollar per share and that the board refused to make the purchase. Guth is said to have stated to the directors that Pepsi was for the first time beginning to show some profit on its operations. His suggestion, so it is said, was that Loft purchase the thirty-five thousand shares and apply the purchase price of thirty-five thousand dollars to the account of Pepsi's indebtedness to it. Guth according to the defendants was the only director who favored Loft's accepting the offer. I am not clear as to the exact use which the defendants hope to make of this alleged circumstance except possibly to show thereby that it again brought to the attention of the directors, as claimed by the defendants, that Pepsi had been obtaining substantial credits from Loft as would be evidenced by the fact that thirty-five thousand dollars would

be in only partial payment thereof. Now, according to the defendants there was produced at the meeting a certificate for the thirty-five thousand shares, already made out in the name of Loft and ready for delivery. This, if true, would be in strong corroboration of the fact of the offer. It would, though, I think be a rather unusual circumstance, because I think it may be fairly said that a person who hopes to make a sale of stock to another is not accustomed to come to the bargaining table with a certificate made out in advance in the name of the hoped-for purchaser. Furthermore, the defendants' description of how the certificate was passed around among the directors that they might see it, is interesting if for no other reason than, if it be true, that a stock certificate seems to have been a thing of curiosity to the directors who were eager, it seems, to embrace an opportunity for the first time to look at one. They all are said to have handled and examined it. An embarrassing circumstance, however, is attached to this episode of the stock certificate for thirty-five thousand shares, its presence and inspection at the meeting. The embarrassment arises from the fact that the meeting was held on December 5th and the certificate which is said to have been there present and inspected bears as its date of issue December 6th. The date, says Guth, was a mistake. I do not think so. Miss McEvoy who was in Loft's employ when this suit was instituted but who later resigned and became employed by Guth, is the one who, Guth says, made the mistake. But Guth has not produced her as a witness to say so. There is an explanation for that stock certificate which I shall not burden this opinion to relate, which shows it to have had not the slightest connection with the meeting of December 5th or of any desire by Guth to sell Pepsi shares to Loft. I am so convinced of the falsity of the alleged stock certificate episode in its relation to the meeting of December 5, 1934, that I consider the defendants' story of that meeting, revolving as it does around the offer and rejection of the stock, to be unacceptable.

The defendants contend that it is not indispensable to corporate action that a formal vote be taken by the directors and recorded in the minutes of their meetings. Accordingly, they say, the absence of any minute recording an authority to Guth to commit Loft to the financing of Pepsi, is not conclusive that no such authority was given. Knowledge on the part of the directors and their unrecorded consent, or even absence of objection on their part accompanied with knowledge that one is dealing with the corporation on the assumption of the corporation's agreement, the defendants contend, are as sufficient to bind the corporation as if its directors had adopted a formal binding resolution. The defendants cite cases in support of the proposition. The cases so cited are in the main if not entirely cases involving the dealings of third parties with the corporation and therefore clearly not relevant. to a case such as this, where the corporate dealings are with the corporation's director-president who is in complete control of its affairs and in a position of dominance over its board.

I shall not review those cases. It is not necessary for me to do so for this, if for no other reason, that my conclusion is that though some of the directors knew that Guth was interested in Pepsi, none of them, excepting possibly Masters, who was treasurer, knew that Guth was drawing upon Loft for practically the entire financing of Pepsi. If they did know it and authorized it, they were clearly breachers of the trust confided to their keeping. Directors who either through friendship for the president of a corporation or for fear of his displeasure or for any other reason, authorize him to use the corporate resources committed to their management or control for the promotion of his own personal projects, are participants in a fraud. As they have no power to authorize the fraudulent acts, so they are equally devoid of power to ratify them. This court has held that a majority of even the stockholders has no power by ratification to bind the corporation to a fraud committed

upon it by its officers and directors. *Eshleman, et al., v. Keenan, et al.,* 21 *Del. Ch.* 259, 187 *A.* 25. The authorities therein cited in support of the rule may be supplemented by *Continental Securities Co. v. Belmont,* 206 *N. Y.* 7, 99 *N. E.* 138, 51 *L. R. A., N. S.,* 112, *Ann. Cas.* 1914A, 777; and *Smith v. Bunge,* 272 *Ill. App.* 182, affirmed, 258 *Ill.* 229, 193 *N. E.* 122. *A fortiori* it must be true that directors who authorized the wrong are without power to validate it by their own ratification.

If Guth's transaction with Loft had been the simple one of borrowing money from the corporation in violation of *Section* 36 of the *General Corporation Law, Rev. Code* 1935, § 2068, then repayment of the loan would constitute full satisfaction of the wrong to it. But the defendants are not in position to claim the benefit of that proposition. This is for the reason first, that the use by Guth of the assets and the Loft organization is traceable in its results directly into a business created therewith and, second, the repayment as before stated was made from the profits of that business.

As to the claim that Loft had no facilities for the manufacture and distribution of a carbonated bottled beverage on the national scale which the Pepsi-Cola enterprise required for successful operation, the answer is that it was immeasurably more capable of doing so than Guth and Grace and Pepsi combined, and the evidence conclusively demonstrates that it was Loft with its resources that did in fact supply all the bone, sinew and vital force which made Pepsi what it now is.

Mention was made a while ago of ninety-seven thousand five hundred shares of Pepsi stock which Pepsi acquired as a result of the Megargel settlement about January 1, 1934, and which Guth now holds. The Megargel suit was against Pepsi and Guth. Guth supplied five hundred dollars of the thirty-five thousand dollars which the

terms of settlement demanded. Loft advanced the remaining thirty-four thousand five hundred dollars. The settlement yielded in addition to the ninety-seven thousand five hundred shares, releases to Pepsi and Guth of any further claim under the Megargel contract. It is suggested by the defendants that in this settlement Guth's five hundred dollars may have bought the ninety-seven thousand five hundred shares of stock and Loft's thirty-four thousand five hundred dollars the releases. That is a suggestion which is more commendable for its ingeniousness than for its acceptability. As the release was personal to Guth, it would seem that if any attempt is made to allocate the respective contributions, Guth's five hundred dollars should be assigned to the releases, and Loft's thirty-four thousand five hundred dollars to the stock. Why should Loft pay out thirty-four thousand, five hundred dollars to secure releases to Guth and Pepsi with respect to a matter with which it is not claimed to have had any concern? Furthermore, the written documents which were contemporaneous with the settlement indicate that the money was to be paid as the purchase price of the stock. That is true especially with respect to the letter of Mrs. Megargel. The cash of thirty-five thousand dollars secured the settlement and among the terms of the settlement was the acquisition of title to Megargel's shares of stock. Loft furnished all but five hundred dollars of the money but Guth through Pepsi received the stock. When the money was finally repaid it was drawn from Pepsi's earnings which equitably belonged to Loft. Loft's money enabled Pepsi originally and Guth later to acquire the ninety-seven thousand five hundred shares. The most that Guth is entitled to would be the return of his five hundred dollars.

As before stated, in December, 1934, about the 31st, Pepsi issued forty thousand of its shares to Grace in settlement of Pepsi's indebtedness to it as shown by the account between the two. Pepsi's books were in a confused

condition. Miss McEvoy is said to have stated to the Pepsi directors in a board meeting held on December 28, 1934, that the balance due to Grace as of that date was the sum of approximately forty-six thousand dollars, and the directors of Pepsi are recorded in the minutes of December 28, 1934, as having authorized the issuance of the forty thousand shares in settlement of that balance. The reconstructed account between the two companies shows the balance due to Grace as of December 31, 1934, to have been $46,286.49.

A lawyer employed by Guth appeared as a witness and testified concerning the preparation of the minutes of the meetings of Pepsi's directors. He was a director. He admits that the minutes as they appear in the book were not concurrently entered. They were prepared by dictation by him "sometime in 1935," and at one time all the minutes were written covering the whole period from 1932. The dictation, he says, was made from notes which he has destroyed. This of course, was a most slipshod practice and admits of the opportunity to make a post-events record to meet any exigencies that may arise. If the testimony of Masters is to be accepted, as I think it should be, there was no thought of a proposition to liquidate the indebtedness with stock in December of 1934. According to Masters who made an *ex post facto* set-up of the Pepsi books, the suggestion of the entry crediting Pepsi's account with the sum of $46,286.49 in consideration of the issuance to Grace of forty thousand shares of stock was conveyed to him by Guth as late as July, 1935, and the retroactive entry was then made.

The integrity of the purported minutes is to be seriously questioned. There were four directors who, according to the minutes, were present at the meeting of Pepsi directors on December 28, 1934. They were McBride, Woods, Jr., Shenton and Miss McEvoy. Miss McEvoy was the secretary. She is shown as having signed the minutes

as secretary. Yet Shenton is the one who wrote them up retrospectively from notes now destroyed which he individually and not the secretary made. Not one of the other four directors has appeared to corroborate Shenton. Woods, Jr., was a witness but did not testify regarding the accuracy of the minutes.

Loft claims that the balance due to Grace from Pepsi on December 31, 1934, was not $46,286.49 as shown by the reconstructed account, but only $38,952.14. The defendants do not concede the entire correctness of this figure, contending that it is immaterial in any event. At the same time that Pepsi owed this money, whatever its amount, to Grace, Grace was indebted to Loft for Loft materials which composed a part of the syrup that was the basis of Grace's account against Pepsi. The indebtedness of Grace to Loft on December 31, 1934, was $20,430.00, exclusive of Loft's claim of $6,063.07 for concentrate which Loft contends was shipped by Loft to Grace but never billed to it during 1932 and 1933. The evidence appears substantially to justify an indebtedness for unbilled shipments in that amount. If this figure be added to the amount shown by Loft's books as due from Grace to Loft, we have a total indebtedness due from Grace to Loft on December 31, 1934, of $26,493.07. This figure may be fairly taken as a Loft contribution, as of that date, through Grace to Pepsi's financing, which was paid for *pro tanto* by Pepsi to Grace on December 31, 1934, by the issuance of the forty thousand shares of stock. Thus Loft assets supplied a substantial portion of the consideration which went to Pepsi for the stock. As of the same date, Pepsi owed Loft $39,231.86 on its merchandise and money accounts, and Guth personally owed Loft $100,807.59. The total of these open accounts, including the amount for unbilled concentrate above referred to is $166,532.50. Now since Guth, Grace and Pepsi are really one it thus appears that when Guth as Pepsi was delivering to himself as Grace forty thousand shares of stock in

liquidation of a forty-six thousand dollar (or thirty-eight thousand dollar) debt of himself (Pepsi) to himself (Grace) due for syrup into which as much as possibly $26,493.07 of Loft merchandise had been compounded, there was due and unpaid to Loft from Guth and his two companies over one hundred and sixty thousand dollars. Since Guth was without means of personally financing Pepsi and was indeed being personally financed by Loft, I do not think it would be just to take any view other than this with respect to the forty thousand shares, viz., that it was Loft's resources and money that enabled Guth to have Grace settle its claim against Pepsi by taking stock therefor. The real situation was that Guth took values from Loft and with a portion thereof bought stock for Grace, some of those values, viz., the merchandise supplied by Loft, being traceable and identified as entering directly into the syrup which Pepsi received from Grace and the charge for which supplied the consideration for the stock.

The bill seeks an accounting from Guth personally for all sums misappropriated by him in connection with the liquidation of a company known as Chocolate Products Company, which was the wholly owned subsidiary of another wholly owned subsidiary of Loft. Guth was entrusted by Loft with the duty of liquidating Chocolate Products. Loft is the formal assignee of Chocolate Products' rights. In the course of the liquidation, Guth is shown to have withdrawn from the cash on hand of Chocolate Products the total of thirty thousand dollars. Guth does not deny the withdrawal. He says he thought he had repaid it. Loft knew nothing whatever about the transaction. No entry was made on Loft's books showing it, although Guth says he instructed Dodd to see to it that an appropriate entry was made in Loft's books disclosing the item as a charge against him. Unfortunately for Loft, the charge was never entered. After Guth left Loft in October, 1935, Miss McEvoy who had not yet left Loft's employ to enter into Guth's

and who appears to have known of the thirty thousand dollar transaction, informed the new Loft management of the fact. Reference to the Chocolate Products books showed it. But after Miss McEvoy left Loft, several pages in the Chocolate Products books were excised therefrom, including the one which recorded the thirty thousand dollar withdrawal. Miss McEvoy is shown to be the last person who had the unexpurgated book. Neither denial nor explanation for this rather mysterious occurrence has been furnished by the defendants.

Guth has had ample opportunity to explore the books of Loft showing the state of his account with it. The evidence shows that the thirty thousand dollars has never been repaid by him. I can see no occasion for ordering the stating of an account between him and Loft with respect to his personal indebtedness. The books dealing with the account have all been opened to him and the result shown by them is in evidence. Guth has not challenged their accuracy in any respect. All that he says is that if the account shows that he still owes the thirty thousand dollars, he is ready and willing to pay it. The sum appears to be owing. Unless Guth advances a reason for recanvassing the matter, the decree should declare his liability for the thirty thousand dollars and order its payment. If, however, he conceives that the evidence thus far introduced, notwithstanding its apparent thoroughness, is yet not all that is obtainable, he may make his contention to that effect and, if it seems proper, the branch of the case dealing with the Chocolate Products item will be specially dealt with in the decree for an accounting.

The bill prays that all the shares of Pepsi standing in the names respectively of Guth and Grace be decreed to be impressed with a trust in favor of Loft and that they be decreed respectively to make assignment and transfer thereof to Loft.

The bill also prays that Guth be decreed to account for

all sums of money withdrawn by him from Pepsi by way of loans or received by him from Pepsi in the form of a distribution of Pepsi profits or in any other manner. Since Loft is the equitable owner of Pepsi which is a defendant, this prayer may be regarded as one which Loft urges in its derivative right.

The bill further prays that Grace be decreed to account for all the profits earned by it in connection with the sale of Pepsi-Cola syrup and for all moneys received by it in the nature of dividends on the Pepsi stock standing in its name or received by it in the way of distribution by Pepsi of its profits in any manner.

Taking the view of the case I do as disclosed by the foregoing discussion, I am of the opinion that the prayers of the bill should be granted.

This case has been a long and tedious one. The testimony covers nearly ten thousand pages of stenographic transcript and the exhibits number about six hundred, many of which bear under a single designation large collections of related documents. The printed briefs consume over nine hundred and fifty large pages. I mention these facts in order to apologize for the unusual length of this opinion. But extensive in length as the opinion is, there are yet many matters which I have omitted to comment upon in the interest of what, notwithstanding appearances to the contrary, I venture to call brevity. Such matters, though of weight and influence in the process of arriving at a decision, are not specifically mentioned. They are reflected in general statements of fact which are found interspersed throughout the foregoing discussion.

Let a decree be submitted in accordance with the foregoing.

NOTE.—An interlocutory decree was entered in accordance with the foregoing opinion, which decree was affirmed by the Supreme Court on appeal by Guth and The Grace Company, two of the defendants. See *post* p. 249, 5 *A.* 2d 503.