**Peter ACAMPORA, Plaintiff,**

v.

**Ormand N. BIRKLAND et al., Defendants.**

Civ. A. No. 7038.

United States District Court D. Colorado.

July 10, 1963.

Haskell, Helmick, Carpenter & Evans, Denver, Colo., and Milton Paulson, New York City, for plaintiff.

Lewis, Grant & Davis, Denver, Colo., for defendants Ormand N. Birkland, Donald C. Bromfield, Ray F. Frey, Joseph B. Neville, Aksel Nielsen and Albert C. Wedemeyer.

Modesitt & Shaw, Denver, Colo., for defendants C. Frederic Meyer, Charles F. Smith, J. William Tempest, FIF Man-

agement Corporation, and FIF Associates, Inc.

DOYLE, District Judge.

The plaintiff brings this derivative action as a shareholder and on behalf of Financial Industrial Fund, Inc., (Fund). The defendants (in addition to Fund), are Financial Industrial Fund Management Corporation (Management), and Financial Programs, Inc. (Programs). Also named are the principal officers of Management and Programs and the officers and directors of Fund (affiliated and non-affiliated with Management).

The facts herein are, for the most part, undisputed, and it is deemed unnecessary to formulate and enter formal findings and conclusions. The findings and determinations of fact and of law appear in the statement of the case, the interpretations of words and phrases, and in the determinations of contentions of the parties in the course of this opinion.

The claims consider only that period from November, 1957, when plaintiff acquired his shares in Fund. The examination nevertheless, takes us back to the origins of the enterprises, at which times the policies were formed which are now under attack.

The Fund is an open-end, diversified mutual fund, organized in accordance with the Investment Company Act of 1940, (the Act).[1] Management is the sponsor, financial adviser and underwriter of fund shares. Programs, which is controlled by Management, was organized for the purpose of performing the underwriting and distribution of shares' function for Management and has been now merged in Management.

## A.

## DESCRIPTION OF THE CLAIMS

Plaintiff's basic contention is that the several contracts between Management and Fund are invalid and void:

*First*, because an amendment to the contract adopted soon after passage of the Act was not submitted to the shareholders as required by section 15(a) of the Investment Company Act.[2] Failure to submit the amendment which was adopted in February, 1941, to the shareholders results, so it is argued, in voiding the entire contract so that all payments made by Fund to Management from 1941 forward were unlawful and, at least within the period encompassed by this law suit must be restored.

The *second basic* contention of the plaintiff is that during the period of this suit a larger proportion of the Board of Directors of the Fund were affiliated with Management than is permitted by the Act. It is said that both the advisory and underwriting contracts between Fund and Management were approved and extended by Boards of Fund which lacked the requisite unaffiliated directors under the Act and it is said that as a result payments made were void under the Act and that there must be restoration upon this basis also.

A *third* contention is advanced in relation to the advisory agreement (between Management and Fund) of 1960, together with the 1960 underwriting agreement. It is said that these must be voided also and that the so-called administrative and accounting service agreement also entered into in 1960 was invalid. It is claimed that these are void because they provided for services which properly may be considered within the scope of the advisory service agreement under the Act and therefore demanded, but did not receive shareholder approval.[3]

*Fourth*, it is claimed that invalidity resulted from an effort to renew the advisory agreement of 1940–1941 in the year 1956. In this regard it is said that this was an abortive attempt at renewal because it was not approved by a majority of the unaffiliated directors as required by the Act.

A *fifth* claim is that the 1940–41 management-advisory agreement was am-

1. (Title 15 U.S.C. § 80a–1 et seq.)
2. Title 15 U.S.C. § 80a–15.

3. Only the advisory service agreement of 1960 received shareholder approval.

biguous and was, for this reason void under the Act.

Alternative requests for relief involve the assumption that the management-advisory agreement of 1940–41 was valid. It is claimed, however, that even assuming validity, Management improperly interpreted it so as to result in the payment by Fund to Management of moneys which Fund was not required to pay under the agreement. Demand is made for these alleged overpayments.

*Sixth*, it is maintained that the payments which have been made by Fund to Management consisting of the advisory fee, plus the items of office expense and other additional expense exceed the payments made in the industry and hence are equitably excessive. Considering all the circumstances, it is argued, there was unlawful overreaching whereby there should be restoration of the excess.

Claims are also asserted against the several individuals, the affiliated directors, C. Frederic Meyer, Charles F. Smith and J. William Tempest. The theory is that if Management is required to restore moneys on any of the grounds briefly described above, the affiliated directors who were themselves responsible for these payments should in turn be held liable. As to the non-affiliated directors, who are Ormand N. Birkland, Donald C. Bromfield, Ray F. Frey, Joseph B. Neville, Aksel Nielsen and Albert C. Wedemeyer, the argument is that these men were charged with the responsibility of protecting the assets of Fund and that in permitting payments to be made either illegally or contrary to contract, they violated their fiduciary relationship and were guilty of gross negligence and should be personally responsible for the moneys which were paid, at least during the period of their tenure.

### B.

### HISTORY OF FUND AND MANAGEMENT

Fund was organized in the year 1935. It was then called the Financial Securities Fund, Inc. It was incorporated under the laws of Delaware, but at all times since its organization it has had its principal place of business in Denver, Colorado. It is a so-called open-end, diversified investment company, commonly known as a mutual fund. It is registered under the Investment Company Act of 1940. Mr. Charles F. Smith was one of the principal organizers of Fund and he served as its President and Chief Executive Officer until November 3, 1960. It is claimed by plaintiff that Smith has effectively selected or recommended the nomination of most of the men who have served as directors of Fund. Defendants admit that as Chief Executive Officer Smith has taken an active part in bringing men into positions of authority in Fund, but maintain that there is no sinister aspect to this; that it does not follow from this fact that Smith handpicked people which he could and did control.

Management was incorporated under the laws of Delaware in 1932, and at all times thereafter its principal place of business has been in Denver. Continuously since 1935, Management has furnished investment-advisory services to Fund and has acted as principal underwriter and distributor of Fund's shares and investment plans. Mr. Charles Smith has been the Director and President of Management during the years 1932 to July, 1960. J. William Tempest and C. Frederic Meyer have been vice presidents and directors of the Fund since 1959; Mr. Tempest has been a director of Management since 1955, and from 1957 to date has served as assistant to the Vice President and President. Mr. Meyer has been a vice president and a director of Management since 1958.

Financial Programs, Inc. was organized in 1955, and although it has been a separate corporate entity, it has been very much a subsidiary of Management. The principal shareholders, officers and directors of Programs have been substantially the same as Management. Thus, in effect Management has allowed

Programs to participate in the distribution of Fund's securities—has allocated to Programs a share of the underwriting profits. It would appear, however, that Management and Programs now have been merged into a single corporate entity.

Until the year 1957, Mr. Smith was the owner of approximately fifty-two per cent. (52%) of the stock of Management and Programs. In that year he sold twenty-four per cent. (24%) of the stock of both companies to Townsend Investment Company. At the same time, the defendant Townsend [4] became a director of Fund; then, in November, 1960, Smith sold the major part of his remaining stock of Management and Programs to the First Security Investment Company; thereafter, the defendant Edwards, a representative of First Security Investment Company, became President and a director of Fund, and Chairman of the Board of Management and Programs. Since the purchase of shares of Management by First Security, the major part of the stock of Management and Programs has been held in voting trusts consisting of five trustees, Smith being one of the trustees, and three of the remaining four being affiliated with First Security Investment Company.

Beginning in 1935, when the Fund was organized, Management undertook to promote and support it, and during the early years of its existence Management actually provided the necessary funds for the operation of Fund since it did not show a profit. It is not surprising, therefore, that Management's control of Fund throughout the years here in question, has been effective. The method which is apparent here, that is, a sponsoring company organizing and controlling a mutual fund, is seemingly not uncommon; as a matter of fact, the Investment Company Act of 1940 permits, and indeed seems to encourage such practice. It does, however, impose restrictions against full and complete control by requiring that a minority of the Board be independent.

Starting in 1935, continuing until June, 1940, Management served as Fund's principal underwriter and exclusively handled the sales and distribution of Fund shares under a contract. During this period Fund had a contract with one Richard M. Scott, Jr., under which Scott served as investment adviser for Fund's portfolio in return for which he was to receive an annual fee of one-half of one per cent. of Fund's net assets. Then, on June 1, 1940, a new contractual relationship came into being: the board of directors of Fund, and ultimately the shareholders, approved a contract entitled "Administrative and Service Agreement." Under the terms of this contract Management undertook to perform all administrative functions for Fund and also undertook to employ independent investment counsel for the benefit of Fund for the purpose of the rendition of investment advice pertaining to Fund's portfolio. In return, Management received a fee equal to one-half of one per cent. of Fund's yearly net asset value. This June, 1940 contract, which will be referred to in detail hereinafter, is the principal bone of contention in this action since it is maintained by plaintiff that it was rendered void by failure to submit to the shareholders an amendment adopted by the Board of Directors in February, 1941.

Another amendment, passed June 3, 1941, was approved by the shareholders. It allowed Management the choice of serving as investment adviser to Fund or continuing (as under the 1940 agreement), to employ independent investment counsel. The shareholders ratified this amendment at their annual meeting held July 17, 1941.

The parties operated under the 1940 agreement as amended until November 3, 1960. In the meantime, however, several other supplemental contracts were entered into dealing with matters other than administration and investment ad-

4. (who has not been served in this action)

visory service; e. g., October 5, 1944, Fund agreed to employ Management as exclusive selling agent and as general distributor of Fund shares for direct sales under the so-called systematic investment plan for unit trusts, a system which allowed small investors to make regular, periodic installment payments looking to acquisition of shares of Fund stock. This 1944 contract was superseded on September 1, 1959, by a general distribution contract in which Management was given the authority to employ a subdistributor, but the general provisions of the 1944 agreement were substantially retained.

On November 3, 1960, Fund, acting with the approval of the Securities and Exchange Commission, entered into three new contracts with Management. The Management Service Agreement of 1940 was now replaced by two separate contracts, an investment advisory agreement and an administrative and accounting service agreement. A new general stock distribution contract was also included. This was to take the place of the 1959 distribution agreement, although there is no noticeable change between these two contracts. The investment advisory contract of 1960 was submitted to the shareholders of Fund even though it in itself effected little change in the relationship between the parties. The advisory service rendered by Management continued substantially the same under the new contract and the fee basis remained the same. However, the administrative and accounting agreement was very specific in spelling out the exact obligations of Management in this area and the expenses which were to be borne by Management and by Fund; however, neither this contract nor the general distribution contract was submitted to the shareholders and plaintiff claims invalidity based upon this fact.

The closeness of the relationship between Fund and Management is to be especially noted. Fund grew up under Management's sponsorship. Through the years they have shared office facilities and have oftentimes shared employees as well as officers, directors and managers. However, in 1957, the employees who had rendered service to or for Fund and who had been on Fund's payroll were all placed upon Management's payroll, with Fund reimbursing Management in the amounts paid out for services to Fund. The purpose of this, according to the evidence, was to allow Fund's personnel to take part in a profit-sharing plan sponsored by Management and also for the purpose of facilitating the payment of these employees.

Considerable evidence was offered to show the procedure incident to the rendition of advice from Management to Fund and the procedure in acquiring Fund's portfolio securities. Management has an extensive investment research division headed up by the defendant Meyer. This division studies industries looking to investments. It obtains factual information such as reports and financial statements, and on occasion actually investigates the operation of companies before buying shares. These studies, together with proposals, are submitted to an investment committee consisting at the present time of Dr. Edwards, Meyer, Hunker and Tempest.[5] From these studies the investment committee prepares recommendations as to purchases and sales of securities for or from Fund's portfolio. This information is supplied to members of Fund's board and is studied by them prior to their monthly meetings.

Detailed testimony has been presented showing the extent of participation in decisions by members of the board of Fund, and while it is to be inferred that recommendations of the investment committee are generally followed, it would nevertheless appear that Fund's board devotes a considerable time at its monthly meeting considering the recommendations of the investment committee together with the data supplied by the investment research division of Manage-

5. All of them are affiliated with Management.

ment, and on occasion refuses to follow these recommendations. It would appear also that Meyer, as head of the investment research division, has a certain discretion in determining amounts of stock to be bought and sold, and manner of purchasing. The Fund trader works under the supervision of Meyer in contacting brokers. The evidence adduced establishes that the brokers are selected upon the basis of their ability to perform the service at hand.

Since May 31, 1940, the assets of Fund have increased amazingly. On that date the total in assets were $880,967.22, whereas in the year ending August 31, 1961, Fund's net assets were $243,436,-611.00.

## C.

### COMPOSITION OF THE BOARD AND BACKGROUNDS OF ITS MEMBERS

For the purpose of establishing that the membership of the Board was such that there was a violation of Section 10 (a) of the Act so as to render certain board action void and also in order to show that the several board members had violated their fiduciary duties to the Fund and were, therefore, personally liable, evidence was offered as to the relationship of the board members of Fund to Mr. Smith and to the Management corporation, and as to personal gains and profits derived by some of the board members from these enterprises. Most of the members in question became board members late in the game, so to speak, and after the policy lines had been permanently established. Nevertheless, it is contended by plaintiff that they acquiesced in policies which a prudent man would have recognized as being contrary to the best interests of the Fund. It is conceded, however, that in order for plaintiff to establish personal liability against the unaffiliated board members, he must at a minimum show that their actions or omissions constituted gross negligence.

During the period beginning 1957 and continuing through 1962, the board of directors was composed of the following persons:

| Date | Name |
| --- | --- |
| 1957 | Smith |
| | Bromfield |
| | Frey |
| | Neville |
| | Nielsen |
| | Phillips |
| 1958 | Smith |
| | Bromfield |
| | Frey |
| | Neville |
| | Townsend |
| | Nielsen |
| | Phillips |
| 1959 | Smith |
| | Bromfield |
| | Frey |
| | Neville |
| | Townsend |
| | Nielsen |
| | Phillips |
| 1960 | Smith |
| | Bromfield |
| | Frey |
| | Neville |
| | Davidson |
| | Tempest |
| | Meyer |
| | Birkland |
| | Wedemeyer |
| | Phillips |
| 1961 | Smith |
| | Bromfield |
| | Frey |
| | Neville |
| | Tempest |
| | Meyer |
| | Edwards |
| | Hinkley |
| | Phillips |
| | Birkland |
| | Wedemeyer |
| 1962 | [same as 1961] |

Plaintiff's evidence is particularly directed to Spencer Phillips, Donald C. Bromfield, Ray F. Frey and Morris M. Townsend. As to these men, the contention is that their relationship with

Fund and Management and the relationship with Mr. Smith was such that they must be regarded in law as having been affiliated with Management so that at various times the board did not satisfy the demands of section 10(a) and 15(c) of the Act in that there was not the requisite forty per cent. of non-affiliated directors on the board; and so, looking to whether these men were affiliated and also bearing upon whether they violated their fiduciary relationships with the Fund, some review of the evidence as it relates to these individuals is necessary.

*Raymond F. Frey* is the owner of his own printing company in Denver and has been so engaged for forty years. His firm has performed printing for both Fund and Management since the inception of these organizations. He has been a member of Fund's board since 1952 continuously, and is at the present time a member. Evidence was offered that printing was performed by Frey's company for Management and Fund. The amounts varied and ranged from $22,057.00 in 1957, to zero in 1961 for Management. Fund paid Frey a top of $7,362.00 in 1959, and a low amount of $1,889.00 in 1961. However, according to the testimony, the printing business was performed for both Management and Fund on a competitive-bid basis. The evidence also established Frey to have acquired twenty shares of Management's stock. Stock splits brought this number to two thousand (2,000). He is also the owner of two thousand (2,000) shares of Programs. These holdings amounted to four-tenths per cent. (.4%) of the outstanding stock. In 1960, Frey sold one thousand (1,000) shares of his stock in each of these companies. Also noteworthy (as a counter-balance) is the fact that he has a personal interest in *Fund*. He owns approximately $130,000.00 in Fund shares.

*Donald C. Bromfield:* Bromfield is a principal shareholder and officer in Garrett-Bromfield, which company deals in real estate and insurance business and was formerly engaged in the investment and securities business. He has been a director of Fund since 1949 and has been Vice-President and Treasurer from 1955 to October, 1957, and Vice-President from 1957 to November, 1960. He has received no compensation apart from directors' fees for his services. There is evidence indicating that certain portfolio purchases of Fund have been given to Bromfield's firm, or rather, that he has received "give-up" commissions from other brokers on occasions. Although Bromfield denied that these were so-called "give-up" commissions, there were referral fees of some kind amounting to approximately $3,000.00, the total for the period of five years. Insurance commissions received by his firm were in the range of $2,000.00 to $4,000.00 annually during the period in question, that is, for 1958 through 1962.

Bromfield owns $28,000.00 in Fund shares and his daughter and granddaughter have $18,000.00 invested. The Garrett-Bromfield company's profit-sharing plan has invested $25,000.00 in Fund shares.

*Spencer Phillips:* Has been a director of Fund since 1936. He also has been engaged in the securities brokerage business with a number of different firms in New York City. The evidence showed that the amounts of commissions received by various firms with which Phillips was associated, e. g., for 1954 through 1961, Emanual Deetgen Company received commissions, varied from $45,000.00-plus in 1956 to $14,000.00-plus in 1954. In 1962, Phillips became associated with Model, Roland and Stone and this company received $6,000.00 in commissions for the first three months of 1963. It is to be noted that Meyer gave testimony which remains undisputed that brokerage firms were and are selected upon the basis of their ability to perform an efficient service to Fund, and on that basis only. The evidence also indicated that the Securities and Exchange Commission was fully aware and did not criticize the fact that these commissions were being paid.

*Morris M. Townsend:* There is little testimony concerning Townsend's relationship, except that in 1957 The Town-

send Investment Company, of which he was President, acquired twenty-four per cent. (24%) of the stock of Management and Programs. Later this was transferred to Townsend Management Company. He then became a director of Fund and also at a later time a director of Management. Criticism was leveled at him because of his company's stock interest in Management, charging that he necessarily had an interest in Management profits as against the interests of Fund. However, Townsend is not a party to this action and so as to him it can be contended only that during the brief period of his directorship he was an affiliated rather than a non-affiliated director.

As to *Aksel Nielsen, Albert C. Wedemeyer* and *Ormand N. Birkland,* there is little effort to show that these men were either affiliated with Management, or that they were controlled persons. *Nielsen* was shown to have had only the slightest connection with Smith prior to his becoming a board member. He is not shown to have had any connection with Management. The same is true of *Birkland,* who was shown to have been retired as President of the Kress Company, and to have had a distinguished business record. *Wedemeyer* was shown to have been a professional soldier and to have held highly responsible positions in government and to have had much experience in business. *Neville,* according to the testimony, had some relationship with Smith and with Management. He was a salaried officer of Fund until June 30, 1960, and was at times an officer and director of Management and Programs. He terminated these latter connections in 1959. He testified at length as to the factors which he considered in making various decisions and although Neville's relationship to Management and to Smith was perhaps closer than that of any of the other directors of Fund, it cannot be said from a consideration of all of the evidence that he ever acted in bad faith or with gross negligence.

**D.**

## ANALYSIS OF THE IMPORTANT CONTRACTS

**1.** *The Administrative and Service Agreement:*

This was the June, 1940 contract which has been generally described. This agreement declared that the Fund has been organized for the purpose of investing and re-investing its assets and securities in corporations and the United States Government. It further stated that the Fund was desirous of availing itself of services, information, advice, assistance and facilities available to the predecessor of Management (second party), and that the predecessor to Management was capable of performing for it certain administrative and other services. The contract then went on to provide in paragraph 2 thereof:

"2. The second party shall, subject to the direction and control of the Board of Directors of the Fund, perform all necessary administrative functions in connection with the operation of the Fund's business that may be reasonably requested, from time to time; and without limiting the generality of the foregoing, such administrative functions shall include the furnishing of all necessary assistance in:

"(a) The preparation of all reports now or hereafter required by Federal or State laws.

"(b) The preparation and filing of instruments and statements required in submitting the application of the Fund for qualification of its Shares and Investment Certificates in any state or territory.

"(c) The preparation of prospectuses, registration statements or amendments thereto, that may be required by Federal or State Laws, or by rule or regulation of any duly author-

ized commission or administrative body.

"(d) The preparation of purchase agreements, confirmation forms, certificates, or other papers in connection with the issuance of the Shares and Certificates of the Fund.

"(e) The preparation of statistical data relating to any phase of the Fund's business."

Paragraph 5 obligated Management to furnish office equipment. It provides:

"5. The second party shall furnish, at its own expense, for the use of the Fund, such office equipment as shall be reasonably necessary to carry on the business functions of the Fund."

Paragraph 6 provides that Management was not required to perform legal or accounting or other specialized services not capable of rendition by the regular personnel of the second party. (Plaintiff argues that this required Management to provide every type of service which its regular personnel could or was capable of rendering.)

Paragraph 8 provided for a deduction of amounts paid by Fund as salaries to its officers, fees to its directors, and for traveling expenses incident to their attendance at meetings. [This is an embattled paragraph—it having been construed to require Fund to pay some portions of these salaries.]

There are other parts and portions of the 1940 agreement which will be referred to as the necessity appears.

This agreement was amended in February, 1941 so as to strike out the term "administrative" wherever it appeared, including the title, and so as to substitute in its place the term "management." The amendment also permitted the shareholders to terminate the agreement by vote and this was to conform to section 15 of the Act. Whether these amendments are to be regarded as substantial, so as to

have required submission to the shareholders, or whether formal and could thus have been promulgated by the board of directors without submission to the shareholders, are principal issues in the case.

During the life of the administrative, or management service agreement of 1940, Management provided such items as desks, filing cabinets, typewriters, computers, and other similar office equipment. However, in July, 1960, during the last days of the 1940 agreement, the board of Fund approved the installation of a data-processing system. This equipment, which is called "Ramac" was rented. In connection with the rental of this equipment it was determined by the Board that it was not office equipment as contemplated by the 1940 agreement. It was concluded that this was primarily related to clerical and other expenses and on that ground was allocable to Fund inasmuch as it replaced personnel. Nevertheless, part of the rental was allocated to Management on the basis of actual use.

Controversy also has arisen in regard to the interpretation that was given to paragraph numbered 8, discussed above, having to do with the obligation of Management to pay officers' salaries. In practice, it was determined that certain of the compensation paid to officers was not truly officers' pay; that these men performed nothing more than clerical work, and to the extent that their work was official, that Management was obligated to pay; but to the extent that it was clerical, the Fund was required to make the payments, e. g., Mr. Neville, in the year 1957, was paid $15,000.00. $5,400.00 of this sum was paid by Management as his officer's salary; the remaining $9,600.00 was paid by Fund as compensation for his services in accounting in the officer provision. The same is true of two assistant secretaries and the Assistant Treasurer of Fund, all of whom were paid by Fund on the basis that their work was not work of officers, but rather was ministerial and that they held titles for morale purposes only.

**2.** *The General Distribution Agreement.*

In 1944, Fund and Management entered into an agreement whereby Management was to serve as exclusive selling agent of Fund shares and for this service was to receive a commission of eight and one-half per cent. (8½%) of sales price. An important provision of this contract is found in paragraph 4C which provides:

"C. The General Distributor, at its own expense, shall prepare all sales literature, but the Fund reserves the right to approve such literature. The General Distributor shall bear all costs incident to distribution and sale of Fund Shares."

And also in 4D which provides:

"D. The General Distributor shall perform all administrative duties in connection with the sale of the shares, including the duty to act as agent for the Fund in receiving and confirming orders, and shall pay the expenses thereof."

Under this contract Fund paid the cost involved in entering the names and addresses of shareholders on the books of Fund; sending out annual reports; determining, recording and sending out dividend payments; redemption of shares, including twice-daily computation of Fund's net asset value, and recording and sending out such redemptions. Fund also paid the difference between the amount levied against the shareholder and the total cost of maintaining the so-called unit trust. On the other hand, Management maintained a sales force and sales literature, and received and confirmed orders. Testimony of officers of Management was that it never occurred to any one that the expenses carried by Fund were incident to the sale of shares. Mr. Tempest particularly, testified that while redemption is an incident of the sale and purchase of shares, it is not and was not regarded as an expense incident to distribution and sale of Fund shares.

As to the unit trusts, the testimony was that these were contracts between the Fund and the plan holder and were sponsored by the Fund. It was therefore, believed that it was Fund's obligation to carry the difference in cost which was not covered by the maintenance fee.

One further item demands special mention, and that is the twice-daily computation of the value of Fund shares so as to fix the price at which such shares were sold. There is testimony in regard to this from the accountant, an associate of Alexander Lindsay and Company, who stated that computation of the net asset value twice daily was a function of Fund as provided under the management service agreement to supply financial statements to Management. He determined that it was not statistical data or a function which was incident to distribution and sale of Fund shares.

E.

DEFINITION OF THE ISSUES

1. Whether the February, 1941 amendment to the 1940 Management or Administrative Service Agreement brought about a change so substantial as to render the agreement void as not complying with the requirement of section 15 of the Act that an advisory service agreement must be approved by shareholders;

2. Whether the 1940 Management Service Agreement, as amended, must be declared void because of its ambiguity whereby the commissions made under the said agreement were all invalid and void and must be restored by Management to Fund;

3. Whether at various times during the life of the Management Service Agreement, and when it was renewed from time to time, the composition of the board of directors of Fund failed to comply with Section 10 of the Act in that there were not at least forty per cent. (40%) of the board non-affiliated;

4. Whether a majority of the non-affiliated directors voted for renewal of the Management Service Agreement in 1956;

5. Were there violations of the terms of the Management Service Agreement of 1940 as a result of which fees were paid by Fund to Management for services which under the contract Fund was not required to pay—and if so, what is the remedy?

6. Were the amounts of fees and expenses paid by Fund to Management in excess of amounts prevalent in the industry or otherwise so as to require restoration;

7. Is there personal liability of the board members of Fund, those which were affiliated and those which were non-affiliated; and

8. Is the present action barred by waiver, estoppel or laches?

## I.

■ Plaintiff contends that the agreement has been void and inoperative since the adoption of the February 4, 1941 amendment to the 1940 agreement by reason of the fact that this amendment was not submitted to the shareholders as required by Section 15 of the Act.

Section 15, which is Title 15 U. S. Code § 80a–15, provides that it shall be unlawful for any person to serve as investment adviser of a registered investment company except pursuant to a written contract, which contract, whether with such registered company or with an investment adviser of such registered company, has been approved by the vote of the majority of the outstanding voting securities of such registered company. Upon the basis of this section, together with Section 46 of the Act [6] which provides that every contract made in violation of any provision of this subchapter and every contract hereafter made, the performance of which involves the violation of or the continuance of any relationship or practice in violation of any provisions of this subchapter, shall be void. Thus, the ultimate question is, whether the 1940 agreement is, as a result of the February, 1941 amendment, a contract which had not been approved by a vote of the majority of the outstanding voting securities of such registered company within the meaning of Section 15; in other words, did this 1941 amendment change the basic character of the 1940 contract. If it did, the conclusion would follow that the February, 1941 amendment created a new contract which was not approved by the shareholders.

It has been pointed out that two changes were wrought by the 1941 amendment: *first,* the term "administrative" was stricken from the title and from the body of the contract, and the word "management" was substituted therefor; *secondly,* to conform to Section 15 of the Act, provision was made for shareholder termination. The 1940 agreement had not contained a provision which would have allowed the majority of the outstanding voting securities to terminate the contract. This provision was included in the February, 1941 amendment, as well as the indicated word change.

The change from "administrative" to "management" did not bring about a substantial change in the contract. First, the definition of the term "administer" as it appears in Webster's International Dictionary, third edition, does not support plaintiff's theory. It is derived from the Latin word "ministrare," meaning to serve. The definition given is to *manage* the affairs of (emphasis supplied); to direct or superintend the execution, use or conduct of. There are other definitions which are not here material. The term "manage" is defined in the same work as "to direct or carry on business or affairs: supervise, *administer.*" (Emphasis supplied)

The weakness of plaintiff's argument is that it assumes that the term "administrative" encompasses every type of service, not only management, but clerical, stenographic and every other type of function which could possibly be performed by management; yet, no authority is apparent for such a thesis. More-

6. Title 15 U.S.C. § 80a–46.

over, at no time during the operation under the 1940 contract, as amended, was such a construction given to this term. As a matter of fact, at all times prior to the adoption of the February, 1941 amendment, the parties treated the term "administrative" as meaning management service. While this fact would not have controlling weight under the circumstances, it is entitled to some weight, particularly in view of the fact that the term "administrative" does not have the broad connotations which counsel seeks to give it.

The only case cited in support of the plaintiff's position is not applicable, that is, Lutz v. Boas, 171 A.2d 381 (Del.Ch. 1961). In that case the investment company had a stockholder-approved advisory agreement with a management group; however, the management group did not perform the services demanded in the contract. Instead, the advisory service was furnished by the brokerage firm of Model, Roland and Stone. This latter company made no charge for advisory services but it handled the security purchases and sales for the investment company and did so at prevailing commission charges. Nevertheless, the fee was paid to the management company. It is scarcely surprising that the Delaware Chancery Court condemned this arrangement and held both the management company and Model, Roland and Stone liable. The judgment required the management company to restore all fees paid to it and also required Model, Roland and Stone to restore the commissions which it had received. The reason for this latter decision was that Model, Roland and Stone had been acting as adviser and was doing so without a shareholder-approved agreement as required by Section 15(a) of the Act. The Lutz case bears no similarity to the case at bar because here there was a shareholder-approved agreement in the instant case, modified to be sure, in insignificant aspect. In Lutz the Chancellor correctly decided that there was *no* shareholder-approved agreement.

What about the other amendment which conforms the contract to Section 15(a) (3) of the Act, which provision requires that the contract contain a clause allowing it to be terminated by the board of directors or by a vote of the majority of outstanding voting securities of such company. Shareholder approval could scarcely be demanded for this provision. The shareholders could not refuse to accept the contract on that basis inasmuch as the Act demands that such provision be in it.

The *equities* are against the plaintiff on this point. Counsel boldly demands that the entire agreement be declared void and that the Court declare as a legal consequence that all fees paid from 1941 onward, were invalidly exacted—that failure to obtain shareholder approval of inconsequential amendments in 1941 resulted in there being no contract at all during all those years. Such a ruling would be drastic, radical, unjust and legally unsound.

It is concluded, therefore, that the February, 1941 amendment did not change the contract substantially and thus it did not render it void.

## II.

■■ It is next argued that the 1940 agreement was so vague and indefinite as to be unenforceable and it should, therefore, be held void upon that ground. The statutory authority for demanding that the agreement be held void for ambiguity is Section 15(a) (1) which requires that such an agreement "precisely describes all compensation to be paid thereunder."

Counsel's argument stems from the fact that during the life of this contract there were discussions among the board members at various times as to the meaning of several of the provisions of the agreement. Mr. Tempest is quoted as saying that the agreement "might not be entirely clear" and the contract was not clear on whether or not "accounting and clerical should be paid for by Management or Fund," and that such was the consensus of the opinion of the board. To be sure, there was confusion from time to time as to the scope and extent of the obligation of Fund to pay for

Management and Administrative services. Furthermore, the commission's letter dated September 16, 1960 (defendants' Exhibit AA-D)-1 instructed that the advisory contract be revised so as "to state clearly which of the services required by the Fund are to be furnished by the management corporation at the latter's expense, and which of the expenses of the Fund are to be borne by the management corporation or reimbursed by the management corporation to the Fund." Counsel says that this instruction would not have been given if the contract were clear on these points. The simple answer to all this is that the contract is entirely clear as to the compensation to be paid for the advisory service. This provision is precise in its terms. Paragraph 7 of the agreement provides for payment of a quarterly fee equal to one-eighth of one per cent. of the average daily net assets of the Fund during each three months' period ending on the last days of February, May, August and November. This, of course, adds up to one-half of one per cent. annually. This is all of the compensation that is to be paid for investment advisory and management service. The alleged ambiguity is not with respect to the scope and extent of the advisory service and the obligation of Management to render it, but it is contended that the contract also requires the rendition of clerical services of all kinds. This controversy is not within the mandate of Section 15(a) (1); so, once again it must be concluded that the contention of plaintiff is wholly lacking in merit and must be rejected.

### III.

Plaintiff's argument that an unlawful percentage of the board of directors of Fund consisted of affiliated persons is based upon the definitions which are contained in Section 2 of the Act. The term "Affiliated person" is defined as: a) one holding five per cent. or more of the voting securities of such other person; b) a person, five per cent. or more of whose outstanding securities are held by such other person. It then goes on to provide the definition which is here pertinent:

"(C) Any person directly or indirectly controlling, controlled by, or under common control with such other person;"

Thus, included within the definition of "Affiliated person," is a factual relationship whereby there is actual control. As applied to the case at bar, it would mean that certain of the directors of Fund were in fact controlled by Management, or by Mr. Smith, who for this purpose is equated with Management.

Now, as to the definition of the term "Control":[7] Subsection (9) of Section 2(a) defines this to mean the power to exercise a controlling influence over the

---

7. The full text of this section is as follows:
"(9) 'Control' means the power to exercise a controlling influence over the management or policies of a company, unless such power is solely the result of an official position with such company.

"Any person who owns beneficially, either directly or through one or more controlled companies, more than 25 per centum of the voting securities of a company shall be presumed to control such company. Any person who does not so own more than 25 per centum of the voting securities of any company shall be presumed not to control such company. A natural person shall be presumed not to be a controlled person within the meaning of this title. Any such presumption may be rebutted by evidence, but except as hereinafter provided, shall continue until a determination to the contrary made by the Commission by order either on its own motion or on application by an interested person. If an application filed hereunder is not granted or denied by the Commission within sixty days after filing thereof, the determination sought by the application shall be deemed to have been temporarily granted pending final determination of the Commission thereon. The Commission, upon its own motion or upon application, may by order revoke or modify any order issued under this paragraph whenever it shall find that the determination embraced in such original order is no longer consistent with the facts."

management or policies of a company. It is noteworthy that the subsection (9) definition also declares that "[a] natural person shall be presumed not to be a controlled person within the meaning of this title." Furthermore, the Securities and Exchange Commission, in the case of In the Matter of Fundamental Investors, Inc., Investment Co. Act. Rel. #3596, commented as follows:

"The burden of overturning the presumption against control of a natural person is not one that will be lightly assumed or easily carried to success."

██ Apart from the definition in the Act, which is not particularly geared to the present analysis which involves the control of a natural person rather than a company, the term "control" in this context means the act or fact of control; power or authority to guide or manage; directing or restraining domination. Merriam-Webster's International Dictionary, third edition. Thus, proof of control demands a presentation of evidence establishing actual domination and operation. Mere influence would fall short of this level of proof. In the case at bar plaintiff has not mustered this kind of proof. To be sure, he has shown that many of the board members were friends of Mr. Smith and had been asked to become board members by him. Plaintiff has also shown that certain of the board members benefited financially from the controlling company, that is to say, Management. But even this proof is somewhat shallow and inconsequential, and it does not appear that it has any sinister or diabolical implications. This is not to say that policies which permit board members to receive financial benefits are to be countenanced. However, if such evidence is to be meaningful it should specify the extent of personal benefit or gain which resulted from the business relationship. Here plaintiff is content to show that the companies with which some of the board members were affiliated performed service for the management company. Whether this is significant profit is not shown, and whether it was profit to the individual is not disclosed. Furthermore, the present record points to the conclusion that these contracts were awarded on a competitive basis. Therefore, this evidence can be regarded as no more than a suspicious circumstance which demands close scrutiny. It falls short, however, of establishing that the individuals involved were dominated and managed by a controlling company, and no amount of enthusiastic advocacy or oratory can stretch the significance of these facts so as to accomplish the present objective.

Furthermore, there is no causative evidence here. It does not appear that any director made any decision or any course of decisions because of the business relationship. Plaintiff has been content to show the receipt of business and to argue that this of itself proves control and affiliation. We disagree with him. Even if it be conceded that a prudent director of a mutual fund should refrain from business activity which renders him suspect and which would give rise to the kind of charges which are here made, it does not follow that this fact generates the legal consequence which counsel says it does. The cases cited by plaintiff, Loft, Inc. v. Guth, 23 Del.Ch. 138, 2 A.2d 225; Pearson v. Concord Railroad Corp., etc., 62 N.H. 537, and Dutton v. Willner, 52 N.Y. 312, are all out of context. Discussions as to conflict of interest suggest a solution to the present problem but do not succeed in solving it. It must be concluded, therefore, that the evidence is inadequate and insufficient to establish that any of the alleged unaffiliated directors who were appointed as such, were in fact affiliated within the meaning of Section 2(a) (3) and (9) of the Act.

## IV.

Plaintiff next argues that the 1940 agreement became void because it was not validly renewed at the meeting of Fund's board held February 8, 1956. On this, Section 15(c) of the Act is relied. This provides that every renewal of an advisory service agreement must be ap-

proved by a majority of the directors who are not affiliated persons of the investment adviser.

Section 2(a) (3) (D) defines an affiliated person for this purpose as any officer, director, partner, co-partner, or employee of such other person. On the occasion of the renewal Fund's board consisted of five directors. They were: Smith, Neville, Bromfield, Frey and Phillips. Phillips was absent from the meeting but later sent in a letter in which he attempted to ratify and cast his vote in favor of the proceedings at the meeting, including renewal of the contract. It is argued that Smith and Neville were affiliated with the investment adviser because they were officers and directors of Management and that Bromfield was affiliated with Fund because he was at the time its treasurer, thus leaving only Frey and Phillips as non-affiliated directors eligible to vote on the renewal of the agreement. The argument that Bromfield was for this purpose outside the class of non-affiliated directors, is based upon Section 10(a) of the Act which says that no investment company shall have a board of directors more than sixty per cent. of the members of which are persons who are investment advisers of, affiliated persons of an investment adviser of, or officers or employees of, such registered company.

■ ■ For purposes of satisfying the provisions of Section 10, Bromfield would be classified within the sixty per cent. group because he was then an officer of Fund, the registered company, which is one of the groups mentioned in the section. The important point, however, is that the clause "affiliated persons of an investment adviser" is not the same for the present purpose as officers of a registered company and Bromfield was not an affiliated person within the meaning of Section 2(a) (3) (D). The provision of the Act now under consideration, namely, Section 15(c), says that the renewal must be approved by a majority of the directors who are not affiliated per-

sons. Since Bromfield was not a controlled person he was non-affiliated and is eligible to be counted among this group of persons within the meaning of Section 15(c). The conclusion that Section 15 (c) and Section 10 must be read and considered separately is supported by the opinion of the Securities and Exchange Commission in Fundamental Investors, Inc., Investment Co. Act. Rel. #3596 (1962).

■ Counsel also strenuously argues that the Phillips ratification was invalid under the law of Maryland, but this argument also misses the mark. The Statutes of Maryland (Article 23 of the Maryland Code Annotated 1951, volume 1, page 997), authorizes a written consent to corporate action without a meeting, and while this is not identically the same procedure which is here followed, it is quite similar. While consent in writing is not desirable as a matter of policy, it is impossible to conclude from a consideration of the Maryland decisions that it will render the action taken by the board void.

### V.

■ ■ In considering whether there was a compliance with the terms and conditions of the 1940 Management Service Agreement as amended, whereby Fund paid for services and equipment which under the express terms of the contract was the obligation of Management, it is necessary to construe the contract in the light of the relationship of these parties and the other circumstances surrounding the execution and performance of the contract. The agreement was drafted by counsel for Management, and the construction given to it was not a result of arm's length negotiation. Management was at all times in a position of advantage in its dealings with Fund, and thus was required to observe strictly the terms of the agreement and was certainly required to refrain from the resolution of ambiguous issues in a

manner unfairly beneficial to it.[8] A *fortiori* management could not justifiably interpret the agreement's unambiguous terms in its favor.

## A. *Office Equipment.*

The first of the several areas of difference is paragraph 5 of the 1940 agreement under the terms of which Management was obligated to "furnish, at its own expense, for the use of Fund, such office equipment as shall be reasonably necessary to carry on the business of Fund."

From 1940 until July of 1960—a few months prior to the adoption of the November, 1960 contract—Management recognized its obligation to furnish office equipment to Fund, and the equipment furnished included such items as computers and adding machines. However, in July, 1960 data processing equipment, Ramac, was installed. From the evidence it appears that the main purpose for acquiring this electronic equipment was to facilitate the twice-daily computation of Fund shares. Although Management witnesses Tempest, and Holben (the independent accountant), conceded that this was office equipment which replaced other equipment and personnel, the interpretation given by counsel at the time and adopted by both Management and Fund was that this was not office equipment within the contemplation of the 1940 agreement. Fund was charged sixty per cent. (60%) and sixty-five per cent. (65%) of the rental on the basis that it replaced personnel which it would otherwise have to support.

 It is true, as argued by defendants, that in ascertaining the intention of parties to a contract, the Court should, as far as possible, place itself in the position of the parties at the time of the execution of the instrument and should consider the circumstances surrounding its execution together with the instrument itself. United States v. Essley, (10 Cir., 1960) 284 F.2d 518; Roosevelt Materials Co. v. Nolan Bros., Inc., (10 Cir., 1959) 264 F.2d 807. Such does not, however, justify a rationalization which results in disregard of the plain and unambiguous terms of the agreement. In the instant situation, Management was obligated to furnish office equipment. The fact that new, and substantially more expensive equipment was developed subsequent to the consummation of the agreement does not constitute an alteration of condition which will serve to relieve Management of its obligation. There is no room for quibbling, or rationalization looking to apportionment. "The contract is still to be interpreted according to its true intent, although altered conditions may have varied the form of fulfillment." [9]

## B. *Officers' Salaries.*

 Paragraph 8 of the 1940 agreement requires the deduction from the advisory fee payable by Fund to Management of "such sums, if any, paid by the Fund, as salaries to its officers * * * to the extent that the respective amounts of such items shall, in the opinion of (the Management company) be reasonable."

The items which are questioned in relation to the quoted clause are the salaries of Neville as Secretary or Treasurer of Fund together with the salaries of assistant secretaries. All of these salaries were allocated as between the duties of the officers as such and their non-officer functions. For example, it was determined that Neville performed only $5400.00 of service as an officer and that the remaining $9600.00 of his total salary of $15,000.00 was attributable to

8. Cf. Restatement of the Law of Trusts (2d) Sec. 2b, Fiduciary Relation; Rights and Responsibilities in the Mutual Fund, by Nathan D. Lobell, 70 Yale Law Journal 1258, 1261–1262; Brown v. Bullock, 194 F.Supp. 207, 238 (1961); Meiselman v. Eberstadt, 170 A.2d 720 (Del.Ch. 1961); Aldred Inv. Trust v. Securities and Exchange Commission, 1 Cir., 151 F. 2d 254, 260.

9. 17 C.J.S. Contracts § 295, p. 694, citing Commonwealth of Virginia v. West Virginia, 238 U.S. 202, 236, 35 S.Ct. 795, 59 L.Ed. 1272; see also McCain v. Giersh, 5 Cir., 112 F.2d 70.

his work as Chief Accounting Officer. The lower eschelon officers were regarded as officers in name only. These assistant secretaries had titles for morale purposes only.

The justification offered by Management is that the proviso of paragraph 8 that the amounts must be reasonable gives to Management a discretion which is not shown to have been abused in the adoption of the described policies. Thus, the question is what effect is to be given to the "reasonable amount" clause. The evidence fails to show that the amounts paid to these particular officers were unreasonably high. On the contrary, the salaries, including that of Neville, were amazingly modest. (Neville was shown to have worked conscientiously and responsibly). This is the correct key to interpretation of the instant clause. It does not give a *carte blanche* to determine whether the officers were functioning as such, but rather, a right to question the reasonableness of the amount of salary. Ordinary fairness required Management to pay these amounts and their failure to do so was a violation of the agreement.

C. *Expense of Maintaining the Unit Trust.*

▇▇ Some eighty per cent. (80%) of Fund shares are sold in connection with an installment investment plan whereby the purchaser makes a monthly payment and acquires shares over a period of time. This is called the "unit trust." The expense of maintaining this scheme is very high because of the extensive bookkeeping and because of the necessity for frequent mailing to more than 100,-000 shareholders. Fund is the issuer-sponsor of the unit trust, and in compliance with Sections 26 and 27 of the Act, has an agreement with the First National Bank of Denver under the terms of which the Bank acts as custodian of the shares held under the plans; but Management, as underwriter, derives a commission on the continuing sale of these shares and benefits also by the growth which this build-up brings in that the amount of its fee as adviser increases as the value of the assets of Fund increase. As pointed out above, there is deducted from the dividends payable on the shares in these plans, a maintenance fee. Thus, the unit plan holders are supposed to bear the costs incurred for custodial fees, reports, proxy material, clerical, accounting, printing, postage, etc. Although this maintenance fee has been adjusted, it has not met the entire cost of this extensive and costly service, and Fund has been called upon to make up the difference—this despite paragraph 4 c of the General Distribution Agreement which requires Management to "bear all costs incident to distribution and sale of Fund shares", and paragraph 4 d which calls on Management to "perform all administrative duties in connection with the sale of the shares, including the duty to act as agent for the Fund in receiving and confirming orders, and shall pay the expenses thereof."

The decisive factor is the continuing nature of these sales. The servicing and processing of these accounts is so closely tied to the sale and distribution of the shares as to be inescapably incident thereto. In relation to sales it can be said that the processing and servicing of these accounts is not only a necessary antecedent to sales, but is "directly and immediately relating to or involved in".[10]

Considered from an equitable standpoint, it is grossly unfair to charge Fund with costs which to a great extent are related to benefit to Management. These unit plans insure sales and asset growth all of which means assured profits to Management. Moreover, when Fund absorbs the spillover it means that the non-unit plan shareholders are paying the freight, so to speak, for the unit plan holders.

This differential as between the maintenance fee and the total servicing and processing costs should have been paid by Management and its failure to assume

---

10. Webster's International Dictionary, supra—definition of "incident."

this obligation constitutes a breach of the Distribution contract. Fund is entitled to restitution.

D. *Clerical, Accounting and Bookkeeping Expense.*

 Basically, plaintiff's contention that Management was required to pay all of Fund's bookkeeping and clerical expense derives from the provision in the 1940 Management agreement requiring Management to perform all necessary administrative functions in connection with the operation of the Fund's business, plus the exclusion of legal, accounting and other specialized services (paragraph 6). The assertion is that Management promised to pay *all* administrative expenses and that the items under consideration are of this character. This point was virtually disposed of when the terms "administrative" and "management" were held to be synonymous. Apart from this feature a consideration and interpretation of the agreement as a whole yields the same result. The crucial provision is paragraph 2, that which requires Management to perform all necessary administrative functions and then lists five examples of administrative functions. These involve: preparation of reports, state and federal, preparation of prospectuses, registration statements, purchase agreements and statistical data. Each of the examples of administrative function has to do with high level, specialized work and does not suggest clerical and routine bookkeeping. Paragraph 6 is consistent with this interpretation in that it excludes legal, accounting and other specialized service which is also of a high level management character. There is not a single provision which suggests an undertaking to perform clerical and bookkeeping service.

Furthermore, the agreement viewed as a whole [11] compels a conclusion that there was not the kind of undertaking which the plaintiff seeks to establish. There-

fore, considering the term "administrative" specifically, and viewing all the provisions of the contract on a comprehensive basis, the plaintiff's contention must be, and is rejected.

E. *Miscellaneous Expense.*

 Plaintiff next contends that various expenses, such as making necessary entries with respect to sale of Fund shares, recording the receipts of sales, correspondence with shareholders and planholders, mailing reports, computing and paying dividends, are all incident to the distribution and sale of Fund's shares.

We cannot agree with counsel that these items of internal record keeping and housekeeping can all be regarded as incident to sales and distribution of shares; on the contrary, the described service is not and can not be brought within the scope of distribution and sale since it is incident to the routine substantive functions of Fund.

F. *Twice-Daily Computations of Net Asset Value.*

 This contention of plaintiff also must be rejected. Such computations are not statistical data within the meaning of the 1940 agreement and, furthermore, are not incident to the sale and distribution of shares. To be sure, the computation is a necessary antecedent to the sale since in order to sell the shares the value must be ascertained. It does not follow that this is a function which is related to sale so as to require that the cost of this computation be carried by Management. The crucial factor here is that the computation of the net asset value is part of the preparation of the product, so to speak, for market. It precedes the sale. It is logical and equitable that the cost of preparatory work looking to sale, be held by the producer, that is Fund.

VI.

Plaintiff at first maintained that the advisory fee of one-half of one per cent.

---

11. (and the ascertainment of the intention of the parties requires such comprehensive consideration. United States v. Essley (10 Cir., 1960), 284 F.2d 518, 520)

of Fund's annual net asset value was itself excessive. He has now abandoned this position in view of the decision in Saxe v. Brady, 184 A.2d 602 (Del.Ch. 1962), wherein it was held that the one-half of one per cent. rate was one which prevailed throughout a substantial part of the industry. The Delaware Court refused to find that this percentage was excessive. Plaintiff now takes the position that the advisory fee is excessive in view of the fact that Management does not bear the cost of many expenses which other comparable funds absorb. Financial statements of numerous other mutual funds were offered in evidence for comparison purposes, the object of plaintiff being to show that the mutual funds generally get much more for their one-half of one per cent. than does the Fund in the instant case. Saxe v. Brady, supra, is offered as authority for the proposition that fees in excess of those prevailing in the industry are *per se* excessive. The well-reasoned opinion of the Chancellor in Saxe v. Brady lays down no such rule. The standard of excessiveness seemingly adopted in the Saxe case is that of "shocking" or "unconscionable." The Court there said in part:

> " * * * A court is confronted with inherent difficulties in determining whether payments for services are 'reasonable' or 'excessive.' The value of services is obviously a matter of judgment on the part of the person who must pay for them. Thus, courts are often shielded by presumptions which wisely cause them to defer to decisions of directors or stockholders. Nevertheless, it is clear both in law and in fact that compensation payments may grow so large that they are unconscionable. See Meiselman v. Eberstadt (Del.Ch.), 170 A.2d 720; Lieberman v. Becker (Del.Supreme Ct.), 155 A.2d 596."

As to the fees prevalent in the industry the court said:

> " * * * *First it may be observed that if the flat ½ of 1% rate prevailed throughout the industry,* this would be a very weighty consideration in determining the question of excessiveness.* [Emphasis supplied] Defendants show that 58.3% of all funds active as of June 30, 1961 were charged a flat ½ of 1%, while 29.1% were paying more than that rate."

As to comparison with other funds, the court went on to say:

> " * * * The most that may be said is that there is a tendency for the rate among the larger funds to be less than a flat ½ of 1%. Nevertheless, among these funds that rate is neither extraordinary nor uncommon. * * * Nor can it conclude from the mere fact that others of these funds are paying less, that any increase in their payments for advisory services would necessarily constitute waste. Both are but factors to be considered under the governing test. * * * "

In conclusion, as to the test, Chancellor Seitz stated:

> "What 'devices' may a court employ in answering this difficult question. First of all, I re-emphasize that under the present state of the law the management company is entitled to make a profit apart from salaries paid to its executive personnel. Next, it must be emphasized that the very nature of the compensation arrangement (percentage of asset value) lends itself to the payment of sums having no necessarily reasonable relationship to the 'value' of such services if tested by compensation standards usually applied in the business community. * * * *It is also inherent in the 'percentage-of-assets' approach that at some point the relationship between admittedly reasonable expenses and net profits can become so disproportionate as to be shocking by any pertinent standard.* * * * "

Certainly, the one-half of one per cent. approach leaves a great deal to be desired (even though counsel does not now ques-

tion the propriety of this). Such a guaranteed fee fails to take into account success or failure of the advisory effort. Still another bad feature is that its probable increase is disproportionate to the value of the services rendered. It must, however, be pointed out that this matter is not here in issue. Indeed, the fact that a more equitable scheme could be worked out, or that this writer sees potential abuses in the method, does not furnish a basis for an adjudication of excessiveness.

■ As to whether the one-half of one per cent. formula in the instant case is excessive in view of the fact that Management fails to perform many routine functions which according to counsel other funds do furnish is, as Chancellor Seitz has said, inherently difficult, since the value of such services is a matter of judgment on the part of the persons who pay for them. As indicated previously, the industry practice test is not reliable because it is impossible to consider in depth the internal workings of the various other corporations. This would mean the trial of numerous wholly collateral matters under conditions of handicap. The comparison test, therefore, can be no more than evidentiary. See Saxe v. Brady, supra. Meiselman v. Eberstadt, supra, provides an answer to plaintiff's contention that amounts in excess of the industry average are excessive. This decision dealt however, with officers' salaries. The court said that amounts paid in excess of the industry average are not necessarily excessive.

■ Judged by the tests set forth in Saxe, that is, unconscionable and shocking, it cannot be said from the evidence here presented that the amount paid was excessive because it is impossible to evaluate the service rendered. The fact that it seems high to this writer is not reliable. Furthermore, the net profits of Management do not appear to be unreasonably high. Moreover, the total expense ratio of Fund, .68% (of

total net assets) does not appear to be unreasonably high.

It is concluded that this contention is also without merit and must be also rejected.

## VII.

Two grounds are advanced by plaintiff in support of his demand that the November, 1960 Investment Advisory Agreement and the Accounting Services Agreement of November, 1960 be declared void. *First,* it is said that such contracts were not approved by the requisite number of unaffiliated directors as required by Section 15 of the Act; *secondly,* complaint is made that while the Investment Advisory Agreement was submitted to vote of the shareholders, the Accounting Services Agreement was not—that these two contracts are inextricably connected and that it was invalid to separate them or in any case to fail to submit the Accounting Service Agreement to the vote of the shareholders.

Point 1 has been substantially determined under Conclusion IV, counsel's contention as to affiliation of directors having been there considered. No merit could be discovered in it. On the occasion of board authorization of the November, 1960 Advisory Agreement, there were a total of ten board members. There were Smith, Bromfield, Frey, Neville, Davidson, Tempest, Meyer, Birkland, Wedemeyer and Phillips. Assuming, as counsel argues, that Davidson was affiliated under Section 2(a) (3) (A) of the Act, and that Smith, Tempest and Meyer were affiliated under Section 2(a) (3) (D) of the Act, it would nevertheless be impossible to conclude that there was not the requisite four non-affiliated directors even if Neville is counted as affiliated. He was not at that time statutorily affiliated.[12]

■ Point 2 questions the propriety of separating the two agreements. The thrust of counsel's argument is that this

---

12. (Neville abstained from voting on this occasion.) Phillips and Frey were non-affiliated. So, also, were Wedemeyer and Birkland.

will open the door to fraud—that implicit in Section 15 of the Act is the requirement that the investment advisory agreement spell out all of the service obligations of the management company and that it be shareholder-approved so that there can be no question in the mind of the voting stockholder as to what he is getting. Such a requirement would undoubtedly be desirable as a matter of policy but Section 15 of the Act does not require submission to shareholders of an agreement such as the present accounting service agreement. Sections 15(a) and (c) are limited to advisory agreements. While the potential evils discussed by counsel for the plaintiff are not here cognizable, it is to be observed nevertheless here that the proxy material advised the shareholders that the accounting and other service would be performed by Management at cost and would be billed on that basis to Fund. For these reasons liability based on this contention is also denied.

### VIII.

The last of the plaintiff's arguments raises the question of possible personal liability of the non-affiliated directors. Although the applicable facts have been set forth it is necessary to at least outline the factual and legal framework within which the problem arises. First, it is limited to alleged failure of the directors to properly interpret the contract and insist too upon assumption by Management of the items of expense which have been held properly allocable to it, the other contentions having to do with alleged voidness of the contract having been resolved contrary to plaintiff's contention. Secondly, lack of prudence on the part of the directors would not subject them to liability; this counsel concedes. Admittedly, the standard is that of gross negligence or, according to the contention of the defendant directors at least, is bad faith. Gauging the facts in the light of the gross negligence standard, it is not possible to conclude that the lack of care was so palpable as to render the directors personally liable. It is, however, to be conceded that occu-

pancy of the position of director of a mutual fund is not all fringe benefits, so to speak. These non-affiliated directors have a demanding mission and that is the protection of the assets of Fund and the shareholders. Their position in relation to Management is adversary in character, and if they are to properly fulfill their mission they are obligated to scrutinize the acts and doings of the adviser with great care. Even concluding, however, that the positions are hazardous ones, it does not follow that the non-affiliated directors here were guilty of gross negligence because of failure in this instance to demand compliance to the strict terms of the contract. It is somewhat easier here now to call these contract violations, viewing the matters in retrospect and with the benefit of specialized presentation than it was at the time. The policies with the exception of that which led to the Ramac expenditure, had been set for some years prior to the time these defendants assumed positions on the Board. Furthermore, the interpretations were buttressed by opinions of counsel and of independent auditors. Moreover, the decisions made all appear to have been made in good faith. Such circumstances are incompatible with gross negligence.

### IX.

The numerous defenses, including Statute of Limitations, Waiver, Estoppel, Laches and Election of Remedies have been considered and are determined to be insufficient. Plaintiff took no positive action which now precludes this action. His action in voting for the 1960 Advisory Agreement is not in opposition to the recovery which is being ordered here. His failure to act is not so related to the contract violations as to preclude this action. So, without discussing these matters in depth and detail, it is to be concluded that the defenses are not relevant.

\* \* \* \* \* \*

It is finally concluded that plaintiff have judgment on behalf of Fund in the amounts represented by the improper allocation of Officers' Salaries, Office Furniture and Equipment, and Unit

Trust fees, all as determined in this opinion.

The publication of these findings, conclusions and opinion is not, of course, to be regarded as a final judgment in this case. It is not possible from the evidence which has been presented to compute the amount of recovery. It will be necessary for counsel to ascertain these amounts and to stipulate them if this is possible. This ought to be possible as the items are such as to suggest that they are liquidated. At such time as the amounts have been either agreed upon or shall have been determined, final judgment will be signed and entered.

Although counsel are not required under the rules to file motions for new trial until after the entry of final judgment, it is directed that those objections to this opinion which are now apparent to them, be filed within twenty (20) days after receipt of it. This is in the interest of accelerating the final disposition of the case, but will not prevent the inclusion in post judgment motions of matter or points which are not included in the objections to findings which are now being requested.